UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:07-CV-238-H

VENTAS, INC.                                                            PLAINTIFF

V.

HEALTH CARE PROPERTY INVESTORS, INC.                      DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Ventas, Inc. ("Ventas") filed this suit against Defendant, Health Care Property

Investors, Inc. ("HCP"), claiming tortious interference with contract and with prospective

business relations.  Both HCP and Ventas have moved for summary judgment on a number of

issues.  HCP seeks summary judgment declaring that Ventas's claims are barred by res judicata,

that its proof of causation is legally insufficient, that HCP did not engage in significantly

wrongful conduct, and that Sunrise REIT did not breach its contract with Ventas.  Ventas seeks

summary judgment declaring that HCP is collaterally estopped from litigating several issues, that

Ventas had a valid business expectancy in the approval of the $15 bid, that HCP intentionally

interfered with that expectancy, that the interference was improper, and that all of HCP's non-

damages affirmative defenses are denied.

The Court has issued several opinions in this matter and incorporates its statement of

facts from those opinions.[1]  In the current round of motions, the Court was greatly aided by the

---

[1]On December 19, 2007 (DN 34), the Court considered HCP's motion to dismiss Ventas's claim of tortious
interference with the Purchase Agreement between Ventas and Sunrise REIT.  The Court denied that motion.  On
March 24, 2009 (DN 154), the Court discussed HCP's counterclaim for misrepresentation about the fairness of the
auction process.  The Court dismissed HCP's counterclaims.  On May 26, 2009 (DN 186), the Court discussed
HCP's amended counterclaim and, in the process, whether any claim of preclusion would apply to these claims.

excellent briefing and expert oral argument of counsel.  The Court now seeks to resolve the motions and help narrow the issues the parties must address at trial in this complicated matter.

I.

In view of the Court's knowledge of the evidence, only a brief summary is necessary here.  The Court will reference other evidence throughout the opinion as necessary

Ventas seeks damages from HCP as compensation for injuries sustained in an acquisition deal.  Both Ventas and HCP participated in an auction process to acquire Sunrise REIT.  As part of the auction process, Sunrise REIT required bidders to sign Confidentiality Agreements.  It also required bidders to reach an agreement with Sunrise Senior Living ("SSL"), which managed its senior living facilities, prior to submitting a bid.  Such a bid was considered "unconditional."

After the auction process was completed, in January 2007, Ventas entered into a Purchase Agreement with Sunrise REIT to acquire the company at $15 per unit.[2]  HCP's Confidentiality Agreement contained a Standstill Agreement preventing it from making a bid after the auction concluded.  Despite the Standstill Agreement, HCP submitted, and publicized, an $18 "topping bid" in February.  Subsequently, HCP, Sunrise REIT, and Ventas entered into litigation in Canada to determine whether Sunrise REIT could consider HCP's bid.  The Canadian Courts barred Sunrise REIT from considering HCP's bid until after the unitholders voted on Ventas's bid.  Prior to the completion of the vote, and in conjunction with settling a suit between Ventas and Sunrise REIT, Ventas raised its bid from $15 to $16.50 and re-submitted it to the unitholders.  The unitholders approved the $16.50 bid in late April, completing Ventas's

---

[2] Unless otherwise noted, all currency is Canadian.

acquisition of Sunrise REIT.

II.

Count I alleges HCP tortiously interfered with the Purchase Agreement between Ventas and Sunrise REIT.  To prove such a claim, Ventas must show (1) the existence of a contract; (2) HCP's knowledge of this contract; (3) that HCP intended to cause its breach by Sunrise REIT; (4) that HCP's conduct caused Sunrise REIT's breach; (5) that this breach resulted in damages to Ventas; and (6) that HCP had no privilege or justification to excuse its conduct.  *Dennison v. Murray State Univ.*, 465 F. Supp. 2d 733, 755 (W.D. Ky. 2006) (citing *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995)).  The Court will assume for purposes of this motion that the evidence could support finding the first three elements.

A critical element is that Ventas must show that HCP caused Sunrise REIT to breach the Purchase Agreement.  Ventas claims Sunrise REIT breached the Purchase Agreement (1) by failing to enforce HCP's Standstill Agreement and discussing a non-*bona fide* bid, (2) by failing to use its "best efforts" to promote the $15 bid, and (3) by issuing a misleading press release. The Court discusses each in turn and for the following reasons concludes that the evidence shows that Sunrise REIT did not take any action that could be deemed a breach of the Purchase Agreement.  Consequently, Ventas's claim of tortious interference with contract fails.

A.

The Purchase Agreement requires Sunrise REIT to enforce the HCP Standstill Agreement.  Ventas claims Sunrise REIT failed to enforce the Standstill Agreements by both allowing HCP to make a bid and by discussing that bid.  Of course, Sunrise REIT could not control whether HCP sent it a proposal.  By passively receiving HCP's bid, Sunrise REIT did not

-3-

fail to enforce the Standstill Agreement.  The Purchase Agreement does not prohibit every topping bid.  It permits Sunrise REIT to consider bona fide topping bids.  Ventas's real contention here is that even though the Canadian Courts ultimately concluded that HCP's bid was not bona fide, that Sunrise REIT violated the Purchase Agreement by merely handling it and by seeking a legal determination of its status.

Indeed, once the proposal was on the table, Sunrise REIT had a duty to its shareholders to determine whether HCP's bid was bona fide.  As the Canadian Courts explained, that question was unclear.  Sunrise REIT sought judicial guidance.  Sunrise REIT confronted two conflicting duties: its duty to enforce the terms of the Purchase Agreement and its duty to get the best bid for its unitholders.  Asking for declaratory relief from the Canadian Courts was an appropriate way to resolve the issue.  As a matter of law, such an appropriate course of action neither amounts to a failure to enforce the Standstill Agreement nor be considered a breach of the Purchase Agreement.

HCP's claim that Ventas failed to use its "best efforts" to promote the $15 bid is too ambiguous and amorphous to support the finding of a breach in these circumstances.  Ventas does not sufficiently define what "best efforts" Sunrise REIT needed to perform.  Sunrise REIT submitted the $15 bid to the unitholders with its support.  It maintained its commitment to the bid and promoted it to the unitholders.  It could not control HCP's intervention with an unauthorized bid.  The Court will not attempt to determine with what enthusiasm Sunrise REIT promoted the bid.  Nor will the Court attempt to define what level of enthusiasm would be required to be considered "best efforts."  Sunrise REIT fulfilled its obligation under the Purchase Agreement to submit the bid to the unitholders with its support.  It did not breach the Purchase

-4-

Agreement's best efforts clause.

Finally, Sunrise REIT did not breach the Purchase Agreement by issuing the press release. Ventas's main contention with the release is that it was misleading. The press release accurately stated Sunrise REIT's understanding of HCP's proposal: that it was a valid, fully enforceable proposal on the same terms as Ventas's. Although that turned out to be incorrect, because HCP never submitted a signed proposal nor did it have the required agreement with SSL, Sunrise REIT is not liable for a breach of contract due to its reasonable and genuine belief of false information.

### B.

The classic tortious interference with contractual relations case occurs where a third party disrupts the successful fulfillment of a contract. Here, the essence of the Purchase Agreement required Sunrise REIT to submit the Ventas bid to a vote of the unitholders and to use its best efforts to secure approval. Sunrise REIT met both of these obligations responsibly under confusing circumstances. These differences are another basis for this Court's concern.

The Restatement describes two classic patterns of interference with contract. *See* Dan B. Dobbs, The Law of Torts: Practitioner Treatise Series Vol. 2 § 446 [West current through 2008]. The first is a breach by a promisor or fiduciary, such as when "the defendant intentionally and without justification induces the plaintiff's employee to breach his employment contract and work for the defendant instead of the plaintiff." *Id.* The second is where the defendant "makes the plaintiff's performance impossible or more burdensome," such as when a landlord prevents a tenant from assigning a lease, thereby making it impossible for the tenant to sell his business.

*Id.*; *see also Campbell v. Westdahl*, 715 P.2d 288 (Ariz. 1985).

In *Campbell*, the plaintiff entered a lease under which he ran a plant nursery in the building and on adjoining outdoor space. 715 P.2d at 290-91. The lease restricted assignment and subleasing. After some time, the plaintiff decided to sell his nursery business and entered into a purchase contract. The plaintiff then contacted the landlord to assign the property lease to the new business owner. The landlord repeatedly refused to assign the lease. Since the landlord would not allow a lease assignment, the purchase could not be completed. The Arizona Court affirmed the jury finding that the landlord wrongfully interfered with the plaintiff's purchase contract by unreasonably withholding consent to sublet. *Id.* at 294, 295.

Kentucky explicitly recognized the tort in *Carmichael-Lynch-Nolan Adver. Agency, Inc. v. Bennett & Assocs., Inc.*. 561 S.W.2d 99 (Ky. App. Ct. 1977). Woodson Bend hired the defendant to advertise and do public relations work for the opening of Woodson Bend Resort Club at Lake Cumberland for three to five years. Woodson Bend also hired the plaintiff to handle a portion of the advertising. The contract outlining the joint venture divided the advertising responsibilities and compensation. After a short-time, the plaintiff became dissatisfied with the contract and convinced Woodson Bend to release the plaintiff from the contract and allow it to do all the advertising work. Without the defendant's knowledge, the plaintiff and Woodson Bend agreed that the defendant could then bid on the public relations work, but would do no more advertising. The Kentucky Appellate Court held that the plaintiff had unjustifiably induced Woodson Bend to breach its contract with the defendant, by permitting the plaintiff to do all the advertising work. *Id.* at 102. The defendant recovered his lost profits and costs. *Id.*

-6-

Ventas's claim generally stands out at odds with these cases.  Typical breach of contract cases result in the end of the relationship between the plaintiff and the third party.  Sunrise REIT did not breach the Purchase Agreement simply because HCP submitted a bid that probably violated its Standstill Agreement.  Sunrise did not violate the Purchase Agreement by virtue of its unitholders showing reluctance to approve the Ventas bid.  In truth, no conduct of HCP prevented Ventas and Sunrise REIT from meeting their specific obligations under the Purchase Agreement.  Here, Sunrise REIT met its obligations and Ventas was able to complete a deal with Sunrise REIT.  All of this supports the Court's analysis that ultimately rejects Ventas's tortious inference with contract claim.

III.

In Count II, Ventas alleges tortious interference with prospective business advantage.  Tortious interference liability "is predicated upon an intentional interference, malicious or without justification with known contractual rights possessed by the party suing to recover damages thereof."  *Carmichael-Lynch-Nolan Adver. Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977).  Kentucky follows the Restatement of Torts § 766 on tortious interference.  *Id.*  Tortious interference liability arises where a person, "without privilege to do so, induces or otherwise purposely causes a third person not to . . . . enter into or continue a business relation with another," thereby causing harm. RESTATEMENT (SECOND) OF TORTS § 766 (1979).  Such liability is explicitly not predicated on the existence of a contract.

In Kentucky, to recover for tortious interference with a prospective business advantage, Ventas must show (1) the existence of a valid business relationship or its expectancy; (2) HCP's knowledge thereof; (3) HCP's intentional act of interference; (4) their improper motive; (5)

causation; and (6) special damages.  *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080

(W.D. Ky. 1995).  Many of the elements are easily met here.  Ventas clearly had a contract and

business relationship with Sunrise REIT.  HCP knew about it and Ventas's potential acquisition

of Sunrise REIT.  The Purchase Agreement described a business relationship between Sunrise

REIT and Ventas.  Furthermore, HCP surely intended to effect that business relationship by

publicizing its bid to buy Sunrise REIT at $18 per unit.

Yet Ventas faces quite serious challenges in showing the other elements of its claim.  It

must demonstrate (1) a valid business expectancy that the $15 bid would have been accepted but

for the interference, (2) that HCP's motives or actions were improper, and (3) that HCP's

improper acts caused Ventas's injury, namely having to raise the per unit bid.  The Court will

consider each of these in turn.

A.

A valid business expectancy exists when there is "a reasonable likelihood or a

probability, not mere wishful thinking" that a business relationship will come about.  *Lucas v.

Monro County*, 203 F.3d 964, 979 (6th Cir. 2000) (citing *Trepel v. Pontiac Osteopathic Hosp.*,

354 N.W.2d 341, 348 (Mich. Ct. App. 1984)).  "To demonstrate such a realistic expectation,

Ventas must prove an anticipated business relationship with an identifiable class of third

parties."  *Id.* (*see Schipani v. Ford Motor Co.*, 302 N.W.2d 307, 314 (Mich. Ct. App. 1981)).  A

disappointed bidder with only a unilateral hope of winning does not have a valid expectancy.

*EBI-Detroit, Inc. v. City of Detroit*, 279 Fed. Appx. 340, 352 (6th Cir. 2008) (citing *Timmons v.

Bone*, 2002 WL 745089, *2 (Mich. Ct. App. 2002); *United of Omaha*, 960 F.2d at 35; *see also

NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.*, 664 N.E.2d 492, 497 (N.Y. 1996)

(prohibiting merger bidder from bringing tortious interference suit because it only had an expectation of contractual relations)).

Kentucky courts have not extensively examined the expectation requirement. Thus, predicting a settled view is difficult. Clearly, neither Ventas's hopes nor its unilateral desires give rise to a business expectancy. On the other hand, it is not required to establish with absolute certainty that the expected event would occur.[3] The crux of expectancy is demonstrating the reasonable likelihood that something will occur. Therefore the expectancy element and causation element are intertwined.

The existence of the Purchase Agreement alone does not create a business expectancy that the unitholders will approve the $15 bid. Ventas must show more. It must show that there is a "reasonable likelihood or probability" that the bid would be approved. The reasonable likelihood need only exist prior to the interference. Ventas and HCP both present evidence on this point. Ventas suggests the contemporaneous analyst reports and testimony, market history, expert testimony on empirical analysis of similar transactions, valuation, and institutional unitholder testimony confirm that the $15 bid would have been approved. HCP offers testimony of institutional investors, who owned significant portions of Sunrise REIT, claiming that they would not have approved the bid. Both sides present persuasive evidence on the material question of expectancy.

Though this is a difficult issue, it may be the easiest to resolve of the remaining three elements on this claim. The Court concludes that Ventas has provided sufficient evidence for a

---

[3] If that certainty were required, tortious interference with business expectancy would be superfluous to tortious interference with contractual relations.

jury to find a valid business expectancy in the unitholders' approval of the $15 bid.

B.

Next, the interference must be improper. *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988).   Showing malice or some significantly wrongful conduct is evidence of improper conduct. *Id.* at 859.   Malice may be inferred where the interference lacks justification. *Id.*; *see also Bourbon County Joint Planning Comm'n v. Simpson*, 799 S.W.2d 42 (Ky. App. 1990) ("malice must be shown, but only in the sense of lack of justification for the interference.").   Under Kentucky law, significantly wrongful conduct certainly includes fraudulent misrepresentation, deceit, coercion, threats of illegal conduct, and physical violence, which are specifically highlighted as improper acts. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991); RESTATEMENT § 767 cmt. c.[4]   The Restatement defines fraudulent as "when, to the knowledge or belief of its utterer, [the statement] is false in the sense in which it is intended to be understood by its recipient." *Id.*   It does not require that the misrepresentation be independently actionable.

As the Restatement explains, "the real question is whether the actor's conduct was fair and reasonable under the circumstances." RESTATEMENT § 767 cmt. j.  Pertinent factors may include recognized standards of business ethics and business customs and practice, the concepts of fair play, and "rules of the game." *Id.*   "If it is the primary motive it may carry substantial weight in the balancing process and even if it is only a casual motive it may still be significant in some circumstances." *Id.* at cmt. d.

---

[4] Kentucky has adopted the Restatement (Second) of Torts as the prevailing law of Kentucky on the intentional interference tort. *NCAA*, 754 S.W.2d at 857-58.

Of course, legitimate competition between actors in a market necessarily interferes with prospective business relations.  The difficult question here is whether sufficient evidence exists for a jury to find that HCP's competition crossed the line between competition that is proper and that which is improper.  The Restatement defines competition that properly interferes with prospective relations when it meets four criteria: (1) the prospective relations "concern[] a matter involved in the competition between the actor and the other <u>and</u> (2) the actor does not employ wrongful means <u>and</u> (3) his action does not create or continue an unlawful restraint <u>and</u> (4) his purpose is at least in part to advance his interest in competing with the other." § 768(1) (emphasis added).

Sound arguments abound why HCP may meet each of these criteria.  These may well prevail.  However, Ventas presents two theories to demonstrate the improper conduct.

1.

Ventas says that HCP committed fraudulent misrepresentation because its press release contained material misstatements.  Indeed, on February 14, 2007 HCP did issue a press release publicizing its higher offer.  The press release stated that HCP had "submitted a proposal to acquire" Sunrise REIT for $18.00 per unit, which was 20% higher than Ventas's accepted bid.  It notes that "[HCP] proposes to enter into an acquisition agreement that reflects its significantly higher price and is otherwise identical to the agreement between Sunrise REIT and Ventas."  HCP attached the full text of the proposal letter to the press release.  That letter states that HCP "propose[s] to enter into a transaction which reflects our substantially higher price but is otherwise identical to the transaction entered into by Ventas."  Yet, it goes on to state that HCP is "confident that [it] can enter into arrangements with Sunrise Senior Living on terms

comparable to those entered into by Ventas."

At the time the press release was issued, HCP had submitted an unsigned and conditional proposal to Sunrise REIT.  The terms of the proposal were not identical to Ventas's because HCP had not yet reached an agreement, as required, with SSL.  HCP noted that it still needed to make arrangements with SSL in its proposal letter attached to the press release.  The evidence raises a question of fact whether the statements were actually misleading given the statement that the proposals are identical, which HCP may have qualified in its proposal letter.  The jury must decide whether the statements are false and were intended to mislead the press release's readers.

The jury could question whether HCP actually submitted a proposal given that the purchase agreement HCP submitted remained unsigned.  An unsigned proposal may not reasonably be considered a valid offer, since accepting it may not bind HCP to perform.  Neither statement need be independently actionable to constitute fraudulent misrepresentation for purposes of intentional interference.  Therefore, the Court need not engage in the analysis required for the tort of fraudulent misrepresentation.  Given the evidence, the jury is best situated to determine the intended effect of the language in the press release and whether it was intended to mislead.

2.

Ventas's second theory of improper conduct is that HCP's topping bid process violated accepted norms and customs and that HCP did so because it was motivated by a desire to interfere with Ventas's prospective business advantage.  This theory focuses on the maliciousness of the act.  The bid was made in violation of HCP's own Standstill Agreement, it was unsigned, and, according to testimony, was submitted in a manner procedurally at odds with

custom and tradition.  Ventas argues that HCP's breach of contract, i.e. the violation of its Standstill Agreement, speaks to HCP's motives.  Furthermore, Ventas argues that the breach of contract was at odds with the "rules of the game" established by the contracts.  However, it is doubtful that merely breaching the Standstill Agreement is sufficient alone to establish improper motives.  A reasonable jury could well conclude that the HCP acted in good faith to protect its own interest in acquiring Sunrise REIT.  On the other hand, a jury has enough evidence to permit inferences of improper motives.  Whether HCP's actions were fair and reasonable is best resolved by a jury upon the evidence presented by both parties.

C.

Finally, to sustain a claim for tortious interference, Ventas must prove that it "actually suffered damages as a result of [HCP's] actions."  *In re Davis*, 334 B.R. 874, 886 (Bkrtcy W.D. Ky. 2005) (citing *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp at 1079, 1081)).  Where the improper action does not "adversely affect[] [Ventas's] relationships with any actual or potential customers," there is no causation.  *ATC Distr. Group, Inc.*, 402 F.3d at 718.  In Kentucky, intentional torts require proving proximate cause.  *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 762 n.1 (W.D. Ky. 1998).  That is, the act must be "a substantial factor in bringing about the harm."  *Bailey v. North Am. Refractories Co.*, 95 S.W.3d 868, 871 (Ky. App. 2001) (citing Restatement (Second) of Torts § 431 (1965)).

1.

Proximate cause can be interrupted by a superseding, or intervening, cause.  *See Briscoe v. Amazing Products, Inc.*, 23 S.W.3d 228, 229 (Ky. App. 2000).  A superseding cause is "an act of a third person or other force which by its intervention prevents the actor from being liable for

-13-

harm to another." *Id.* (quoting Restatement (Second) of Torts § 440 (1965); *Donegan v. Denney*, 457 S.W.2d 953, 958 (Ky. 1970)) (internal quotations omitted).  Kentucky courts have not stated whether intervening or superseding causes can break the causal chain for intentional torts. Kentucky's comparative fault statute, however, applies to all tort actions, negligent and intentional.  *Hilsmeier v. Chapman*, 192 S.W.3d 340, 344 (Ky. 2006).  This Court thus predicts that Kentucky would apply the intervening and superseding causes doctrine to intentional torts.[5]

Superseding causes, however, absolve a defendant from liability only if they are "an independent force, not naturally arising out of or related to the negligently created condition." *Seelbach, Inc. v. Cadick*, 450 S.W.2d 745, 749 (Ky. 1966).  The cause must be "unassociated with the original act."  *Pile v. City of Brandenburg*, 215 S.W.3d 36, 42 (Ky. 2006).  The essence of a superseding cause is that it is "extraordinary and unforeseeable."  *Williams v. Ky. Dept. of Educ.*, 113 S.W.3d 145, 151 (Ky. 2003) (quoting *House v. Kellerman*, 519 S.W.2d 380, 383 (Ky. 1974)) (internal quotations omitted).  The Court finds no such act or independent force which amounts to a supeceding or intervening cause.  The Court recognizes, however, that Ventas's actions may be highly relevant as to causation and the extent of damages at trial.

2.

Ventas claims three separate categories of injuries: (1) delay damages sustained by the delayed issuance of its own shares to raise capital; (2) costs incurred through litigation and

---

[5]  In *Brooks v. Patterson*. the Kentucky Court of Appeals (now the Supreme Court) concluded that the plaintiff's own actions could interrupt causation in what may otherwise be a case of tortious interference.  29 S.W.2d 26, 29 (Ky.1930)  Patterson owned a drug store that operated in space leased from Brooks.  Patterson sued Brooks when he placed an advertisement in the newspaper stating that her drug store was for sale for about $6,000.  At the time, Patterson had an offer for $8,500.  That offer was conditioned on Brooks reducing the rent.  After the advertisement ran, the $8,500 offer was rescinded and another offer received at $6,500.  The Appellate Court held that Brooks may have fraudulently induced the rescission of the $8,500 offer, but held that Patterson's choice to accept the lower offer broke the chain of causation.  *Id.* at 29.  Kentucky explicitly rejected the *Brooks* reasoning in *Carmichael-Lynch-Nolan Adver. Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977).

additional professional work done responding to HCP's actions; and (3) price damages in the amount of the increase in the per unit price to purchase Sunrise REIT.  Only the last of these is actionable.

Ventas allegedly planned to raise capital for the Sunrise REIT acquisition by issuing additional shares of its common stock.  It claims to have planned the issuance for February 2007. Ventas did not issue the shares until May 2007, allegedly because HCP's announcement caused Ventas to delay the issuance. During that time, the price of Ventas's shares decreased.  To raise the same amount of money, Ventas had to issue more shares, resulting in an alleged injury to Ventas of between $155 and $180 million.

Undoubtedly, HCP's topping bid delayed any plan Ventas may have had to issue shares in February.  Such a plan would have been inadvisable where a substantial possibility existed that Ventas would not complete the Sunrise REIT transaction.  It is unclear, however, whether Ventas ever intended to issue the shares in February.  Evidence suggests that issuing shares was always a possibility, as the CEO stated in a conference call, and Ventas's CEO testified that securities filings had been filed to proceed with the equity raise.  Yet no evidence establishes an actual date for issuing shares.  HCP claims no evidence can corroborate Ventas's self-serving, after-the-fact statements.

Moreover, HCP's acts are not a substantial factor in bringing about the harm.  HCP may have known that Ventas issues equity to finance many of its acquisitions, however, the evidence does not suggest that HCP knew of any actual plan by Ventas's to issue equity in this transaction.  Nor does any evidence suggest HCP would know the timing on that issuance. Ventas's issuance of shares was not clearly foreseeable.  Furthermore, HCP's actions are not

-15-

necessarily a factor in driving down the value of Ventas's shares.  Ventas received full market value for the shares when issued.  HCP's actions cannot reasonably be considered the substantial factor in determining the market price of Ventas's shares.

3.

Ventas demands the costs associated with the litigation and additional professional work associated with the Canadian litigation with this lawsuit.  Costs also include non-litigation expenses such as a contract with a PR firm and hiring a proxy solicitor.  Ventas made its own choices in how to develop its response to HCP's acts and HCP need not pay for Ventas's response process.  Under the American rule, a party is not responsible for the legal fees and expenses of another.  Further, the chain of causation is too attenuated regarding the PR firm and proxy solicitor.  Ventas independently made certain choices, based on a variety of factors, about how it would promote its bid.  Although HCP's bid may have influenced those choices, the decision was that of Ventas.  A number of factors could have influenced Ventas's decision to more enthusiastically promote its $15 bid.  Plaintiff offers no evidence, other than the existence of HCP's bid, that the proximate cause of these expenditures was HCP's topping bid.  The Court concludes that Ventas may not seek these costs as damages in this case.

4.

Ventas claims that HCP's wrongful actions caused it to pay Ventas $16.50 per unit to acquire Sunrise REIT after having a reasonable expectation of paying only $15 per unit.  Ventas attributes this increase to HCP's topping bid; HCP attributes the increase to Ventas underpricing the original bid and then unilaterally and independently changing its offer.  Much of HCP's argument depends on whether Sunrise REIT's unitholders would have approved the original $15

-16-

price.  As discussed in Section III(A), neither Ventas nor HCP presents conclusive evidence on that question.  Thus, the jury must weigh the evidence and determine whether the $15 price may have been approved.  If the jury concludes the unitholders never would have approved the $15 price, HCP's actions cannot fairly be considered the cause of the price increase.

Even if the evidence suggests that unitholders would have voted to accept the $15 price, HCP still maintains it did not cause Ventas's harm because Ventas independently chose to increase its bid, thereby breaking the chain of causation.  The evidence, however, does not clearly establish that.  If Ventas's $15 bid had support prior to HCP's topping-bid, Ventas must have independently, or with the encouragement of another, increased its price because it feared that price would no longer be approved.

The circumstances under which Ventas increased its bid are confusing and are subject to more than one legitimate interpretation.  Ventas did not raise its bid or even determine the amount of its new bid entirely on its own.  Ventas raised its bid from $15 to $16.50 as part of a settlement negotiated with Sunrise REIT, whom it had sued for breach of contract following the Canadian litigation.  This occurred after HCP had announced its own $18 bid and then rescinded it per the Canadian Court judgments, all while voting on the $15 bid continued.  HCP's announcement had also caused the trading price to increase, resulting in a new composition of unitholders.[6]  Following the Canadian litigation, Ventas sued Sunrise REIT for breach of contract based on Sunrise REIT's actions regarding HCP's interference.  Through proxy voting, Ventas saw that the unitholders were overwhelmingly opposing its bid.  During this time, Ventas

_____

[6] Once HCP publicly announced its topping bid, the market traded on that information.  In the two days immediately following the bid over 60% of units were sold at or above $18.  That resulted in a new shareholder base, which would strongly resist a sale at $15 per unit, since the holders had invested well above that.

and Sunrise REIT came to a resolution in their lawsuit that allowed Ventas to submit a bid for $16.50 with the support of the Sunrise REIT board.

Though Ventas's decision to increase its own bid does not suffice as a superseding cause, the reasons for its actions are subject to question. Nevertheless, Ventas may be able to show that it only increased its bid because it knew that the unitholders would not approve the original bid after HCP had announced its topping bid. In these circumstances, HCP's conduct substantially would have caused Ventas's harm, not some intervening cause. On the other hand, a jury could find that Ventas's increase was unrelated to HCP's original act, arising instead out of the normal auction and subsequent bidding process. Ventas's role in determining the $16.50 price will be a central issue for the jury when calculating the amount of any damages. The jury must decide the effect of Ventas and HCP's actions.

IV.

Throughout this litigation both parties have argued extensively about the effect the Canadian trial court and appellate court decisions. Ventas and HCP raise those questions again in their motions for summary judgment. The parties argue the impact of preclusion in different ways: HCP uses claim preclusion to defeat Ventas's entire complaint; Ventas applies issue preclusion to defeat certain of HCP's defenses. The Court has already addressed many of these arguments, but it will re-examine its findings and address the newly raised preclusion issues. The Court does not intend to slight the importance of these issues by relegating them to Section IV of this Memorandum.

A.

HCP argues vigorously that this entire action is precluded because these same tort claims should have been brought in Canada.  A final judgment on the merits precludes the parties and their privies "from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores Inc. v. Moitie*, 452 U.S. 394, 398 (1981).[7]  Claim preclusion requires proving four elements: (1) a prior final decision on the merits; (2) the present action be between the same parties, or their privies, as those to the prior action; (3) the claim in the present action was or should have been litigated in the prior action; and (4) identity between the prior and present causes of action.  5/24/09 Mem. Op. 8 [DN 186] citing (*Jackson v. Pepper Gasoline Co.*, 144 S.W.2d 212, 214 (Ky. 1940); *Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir. 2003)).

Here, the Canadian court decisions do constitute final decisions on the merits.  The courts interpreted the contract provisions and declared their meaning.  HCP and Ventas were both adverse parties in those proceedings.  Each party argued conflicting interpretations of the Purchase Agreement and Standstill Agreement.  In the Canadian litigation, HCP sought a declaration that Sunrise REIT could consider its bid, while Ventas sought the converse declaration.  However, it is questionable whether Ventas can be required to have raised its tort causes of action in the same litigation.

The Kentucky Supreme Court has stated that "[t]he key inquiry in deciding whether the lawsuits concern the same controversy is whether they both arise from the same transactional

---

[7]A federal court sitting in diversity applies the law of the state in which it sits to determine res judicata questions. *Taveras v. Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007) (citing 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4473 (2d ed. 2002 & Supp. 2004)).  Claim preclusion does apply to decisions from foreign nations and comity dictates the application of res judicata to those decisions. 3/24/09 Mem. Op. 6 [DN 154]; *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971).

nucleus of facts." *Clemmer v. Rowan Water, Inc.*, 277 S.W.3d 633, 635 (Ky. App. 2009) (citing *Yeoman v. Com., Health Policy Bd.*, 983 S.W.2d 459, 464-65 (Ky. 1998)).  Claim preclusion bars claims actually raised as well as those that could have been raised.  Kentucky does not treat claim preclusion so broadly "as to foreclose all possible or potential claims against any known potential defendant not brought within the first litigation." *Watts v. K, S&H*, 957 S.W.2d 233, 236 (Ky. 1997)).  A plaintiff must not raise a cause of action before it accrues.  Therefore, if the cause of action was not ripe at the time of the first lawsuit, a plaintiff is not precluded from later raising that cause of action. *Id.* at 237.

To claim tortious interference, one must prove a "duty, breach, causation, and damages." *Stratmore v. Goodbody*, 866 F.2d 189, 194 (6th Cir. 1989).  A claim is not properly brought where the injury is speculative and may never occur. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967).  When HCP says that the instant claims arise from the same facts as the Canadian case, it tries to prove too much.  To be sure, most of the core facts in each litigation are identical.  However, the core question here is whether Ventas had yet suffered an injury attributable to HCP.

When HCP and Sunrise REIT filed the declaratory judgment action in the Canadian Superior Court on February 22, the Ventas proposal at $15 per unit remained pending as provided in the Purchase Agreement.  That court did not issue its decision until March 6.  The next day HCP withdrew its $18 bid.  At this point, the fate of Ventas's $15 bid was uncertain.  The Appellate Court issued its opinion, affirming the Superior Court, on March 23.  As time passed, it became increasingly clear that Sunrise REIT and Ventas could not secure sufficient unitholder votes to approve the sale at $15 per share.  On April 11, Ventas raised its bid.  The

purchase was not completed until some time after that.  Thus, it seems that the time-line of facts decides the issue.

Ventas's claim did not ripen until HCP had engaged in tortious behavior that caused damages.[8]  Had the Canadian Court determined that HCP's bid was a bona fide offer and that Sunrise REIT could consider it, Ventas would have little basis for arguing that HCP acted tortiously.  Not until sometime after that ruling was issued did actionable harm either occur or become evident.  No actionable harm could be attributed to HCP until the Canadian Courts determined that Sunrise REIT could not consider HCP's bid.  More important, no actionable damage occurred until Ventas increased its bid and the unitholders approved it.  The Court respectfully concludes that claim preclusion does not prevent Ventas from bringing this cause of action.

### B.

Ventas argues that HCP is precluded from re-litigating several specific issues.  Parties may not re-litigated any issue actually litigated and finally decided in a previous action.  *Yeoman v. Com. Health Policy Bd.*, 983 S.W.2d at 465.  Issue preclusion requires that (1) the precise issue being raised in the present case was raised and actually litigated in the prior proceeding; (2) determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought had a full and fair opportunity to litigate the issue in the prior proceeding.  5/26/09 M. Op. 9-10 (citing *Kosinski v. C.I.R.*, 541 F.3d 671, 675 (6th Cir. 2008)). Previous interpretation of

---

[8] The Court addressed similar res judicata arguments in its 12/18/07 Memorandum Opinion, concluding that no harm had befallen the Plaintiff by the Canadian proceedings in February and March 2007.

a contract does not preclude a later challenge to the formation of that contract.  *Hays v. Sturgill*,

193 S.W.2d 648, 651 (Ky. 1946).

In two early opinions, the Court summarized the issues decided by the Canadian Courts.

Those issues, repeated here, are:

> The Superior Court made careful factual findings and issued the following conclusions: (1) Sunrise REIT must enforce the confidentiality agreement between HCP and Sunrise REIT; (2) the Purchase Agreement was reasonably designed to ensure enforcement of the Standstill Agreements; (3) neither HCP's Standstill Agreement nor any action of Sunrise REIT authorized HCP to submit its late bid; and (4) Sunrise REIT conducted the auction in a manner consistent with the Standstill Agreements and it was not the role of the courts to remit contracts entered into by sophisticated parties.
> The Court of Appeal held: (1) HCP's Standstill Agreement precluded HCP from submitting a subsequent bid and the Purchase Agreement required Sunrise REIT to enforce the Standstill Agreement; (2) the requirement that Sunrise REIT enforce the Standstill Agreement against HCP is balanced and objectively reasonable in the context of the auction; and (3) the Sunrise REIT trustees acted reasonably in designing the auction process as a way to maximize its value and conducted the auction to a point of attracting a successful bidder. They acted properly in doing so.

3/24/09 Mem. Op. 7-8.

As the Court summarized in a later decision, the Canadian Courts focused on whether the

Standstill Agreement was enforceable and fair in the context of the auction process:

> First, the lower court concluded that the Standstill Agreement bound HCP not to file an unauthorized acquisition proposal and that Sunrise REIT must enforce that agreement. . . . Second, it concluded that Sunrise REIT did not consent either to a waiver of the Standstill Agreement or to the filing of a late proposal. Third, it concluded that it should not rewrite agreements negotiated between sophisticated parties. . . . Moreover, the Court of Appeals thoroughly discussed the auction process designed both to maximize shareholder value, attract prospective purchasers, and to protect participating bidders.

5/26/09 Mem. Op. 7.

Ventas seeks collateral estoppel on four issues: (1) the Standstill Agreement was valid

and effective when HCP submitted its post auction bid; (2) the Standstill Agreement contractually prohibited HCP from making a post-auction bid; (3) HCP's post-auction bid was not *bona fide*, within the meaning of the Purchase Agreement; and (4) Sunrise REIT's obligation to enforce HCP's Standstill Agreement, as outlined in the Purchase Agreement, was objectively reasonable, valid, and enforceable.

1.

First, the Court explicitly stated in its prior opinions that the Canadian Courts had made no finding on the validity of the contracts. *See* 5/26/09 Mem. Op. 7.[9] Nevertheless, Kentucky law makes clear that a party may attack the formation of a contract in a separate action after a court interprets the contract. Thus, the Canadian Courts' findings do not preclude HCP from arguing that the Standstill Agreement were somehow invalid. HCP cannot re-argue, however, whether the agreement was invalid or unenforceable as interpreted by the Canadian Courts. By enforcing the Purchase and Standstill Agreements to preclude Sunrise REIT from considering HCP's bid, because it violated the Standstill Agreement, the Canadian Courts necessarily decided that their interpretation of the agreements was valid and enforceable. HCP did not litigate, nor did the Canadian Courts decide, whether some flaw existed in the Standstill Agreement's formation, such as fraud. While collateral estoppel does not preclude HCP from making this narrowly focused argument now, it is not clear whether any evidence would support such defense.

---

[9] The Canadian Courts did resolve the issue of whether the auction process was fair. *Id.* at 11. This Court stated: "The Canadian litigation certainly does not bar further argument about the contracts in question." The Canadian Courts interpreted the construction of the agreements, but "made no finding regarding the validity of the contracts themselves." 5/26/09 Mem. Op. 8. By that statement the Court meant only that the contracts could be attacked as induced by fraud, for instance.

2.

Secondly, Ventas also seeks collateral estoppel on the issue that HCP was prohibited from making a post-auction bid.  At the heart of the Canadian litigation was whether HCP was allowed to make the bid.  The Superior Court concluded that HCP's standstill agreement precluded such a bid.  The Court of Appeal agreed.  That issue was clearly litigated.  The Canadian Courts explicitly stated that the Standstill Agreement prohibited HCP from making the bid.  HCP cannot now argue that its bid was permissible under the contracts.

Of course, HCP did make a bid and a public announcement of the bid.  The fact that the Standstill Agreement contractually prohibited HCP's bid does not resolve the wrongfulness of HCP's announcement.  The jury must determine how HCP's breach of contract interplays with Ventas's tortious interference claim.  The Canadian Court judgments do not resolve that question.

3.

Thirdly, Ventas seeks preclusion on the issue of whether HCP's bid was *bona fide*.  The Canadian Courts found, in clear language, that HCP's bid was not *bona fide* under the terms of the Purchase Agreement.  Less clear is the effect of that term on any issue in this litigation.  Ventas states that *bona fide* means "in good faith, sincere, genuine."  Ventas seeks to extend the Canadian judgment to resolve the issue of whether HCP acted "properly" for purposes of the tortious interference claim.  The Court does not believe such an extension of the Canadian decision is appropriate.  The Canadian Courts only concluded that HCP's bid was not proper under the Standstill Agreement and, in fact, breached that agreement.  That finding does not collaterally estop HCP from arguing that despite breaching the Standstill Agreement it had

-24-

otherwise proper motives when issuing its topping bid.

4.

Lastly, Ventas argues that the Canadian judgments necessarily and finally determined that the Purchase Agreement was objectively reasonable, valid, and enforceable.  Similarly, a prior decision on the interpretation of a contract does not preclude a party from later attacking its formation.  The Court does believe that the Court of Appeal concluded that the Purchase Agreement's requirement to enforce the Standstill Agreement was balanced and objectively reasonable in the context of the auction.  The Canadian judgments do not resolve whether HCP's violation of the Standstill Agreement was improper for purposes of the tortious interference claim.  Nor does it resolve what the customs and norms are in these types of auctions.

IV.

Ventas has moved for partial summary judgment on HCP's affirmative defenses.[10] Although HCP enumerates its myriad defenses, they can be classified into just a few groups. Most of these defenses should be viewed more properly as evidentiary issues bearing on the elements of Ventas's causes of action, rather than legal defenses.[11]  Some of the defenses address issues that will be critical factors in the case, specifically whether HCP's conduct was wrongful. The evidence is not conclusive one way or another on most of the defenses.  The Court will address Ventas's motion by grouping the defenses and treating each group separately.

First, several defenses go to the motive and wrongfulness of HCP's conduct.  The

---

[10] Ventas moved for summary judgment on all affirmative defenses except those related to damages: No. 22 regarding punitive damages and No. 23 regarding whether Ventas suffered an injury.

[11] Of course, if the evidence at trial were to prove a legal defense to any claim, the Court will consider a proper motion.

-25-

defense of good faith assertion of a legally protected interest, justification, privilege, no wrongful

means, and the validity of the Purchase Agreement all relate to whether HCP's conduct was

proper.  The Court already examined the evidence regarding the wrongfulness of HCP's conduct.

As stated previously in this opinion, material issues of fact exist.  Summary judgment is not

appropriate for either party on the issue of wrongfulness.  HCP may raise these arguments at trial

and to the Court as the evidence permits.

Second, several defenses relate to causation and damages.  Unclean hands, *in pari*

*delicto*, the plaintiff's own fault, fault of third parties, settlement set-off, double recovery, unjust

enrichment, performance, prevention of performance, intervening or superseding cause, and

failure to mitigate defenses all bear on the issues of causation and appropriate damages.  Those

defenses center on the critical issue of whether HCP's actions caused Ventas's harm and to what

degree Ventas was damaged.  The Court has also stated that material issues of fact exist

regarding causation and damages.  Summary judgment is not appropriate for either party on

these issues prior to trial.

Third, HCP raises the defenses of waiver and consent.  Those defenses allege that Ventas

either waived its claim for tortious interference or that it consented to the tortious interference.

The Court has previously stated, in agreement with the Canadian judgments, that Ventas did not

consent to HCP's topping bid and associated conduct.  Furthermore, in ruling on the issue of

claim preclusion, the Court concluded that Ventas did not need to raise its cause of action

previously, but that it retained its claim.  Therefore, neither the claim of waiver nor consent can

be maintained in this action.

Finally, HCP claims that Ventas is judicially estopped from arguing that HCP's offer

could have been concealed from Sunrise REIT unitholders.  HCP alleges that Ventas argued a contrary position in the Canadian litigation and thus is judicially estopped from making a contradictory argument here.  A party cannot assert a claim in a legal proceeding that is inconsistent to or contradictory of a claim taken by that party in a previous proceeding.  *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 618 (6th Cir. 2009).  HCP quotes Ventas's previous argument as being:

> [I]t should be for the unitholders of the target to decide which course to take. If they reject the offer of the bidder who won the auction at the forthcoming unitholder vote, the purchase agreement can be terminated and the breaching bidder's standstill obligations thereafter waived by the target, and it will be free to make any proposal it wishes to make to the target.

Factum of Ventas, Inc. ¶ 6, No. 07-CL-6893 (Ont. Super. Ct. filed Feb. 26, 2007).

HCP claims that argument should preclude Ventas from now arguing that either Sunrise REIT or Ventas was entitled to suppress truthful information about HCP's bid.  As the Court has already stated, the evidence raises some question as to the truthfulness of HCP's proposal and $18 bid.  Ventas previously argued that once HCP's bid was made public, the unitholders should make the decision what to do with that information.  HCP offers that Ventas wants to now argue that the unitholders never should have known about HCP's bid.  The Court does not find those positions to be contradictory.  Ventas may argue that the unitholders should never have had certain information, but that once the information was public the unitholders should be in control of the effect of that information.  Accordingly, the Court finds no grounds for applying judicial estoppel to Ventas's argument.

The Court will enter an order consistent with this Memorandum Opinion.

July 15, 2009

John G. Heyburn II, Judge
United States District Court

cc:     Counsel of Record

-28-