**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

| | | |
|---|---|---|
| VENTAS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-cv-00238-JGH |
| | ) | |
| HCP, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

**HCP, INC.'S OPPOSITION TO VENTAS, INC.'S PRETRIAL MOTION NO. 8 TO EXCLUDE TESTIMONY OF DANIEL R. FISCHEL**

**[REDACTED VERSION]**

Sheryl G. Snyder
Theresa A. Canaday
Tanya Y. Bowman
FROST BROWN TODD LLC
400 W. Market Street, 32nd Floor
Louisville, Kentucky 40202
(502) 589-5400
(502) 581-1087 (facsimile)

Mark C. Hansen (pro hac vice)
Aaron M. Panner (pro hac vice)
Courtney S. Elwood (pro hac vice)
James M. Webster, III (pro hac vice)
Brendan J. Crimmins (pro hac vice)
W. David Sarratt (pro hac vice)
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (facsimile)
*Counsel for Defendant HCP, Inc.*

August 13, 2009

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION AND SUMMARY ..... 1

I. Professor Fischel Is Qualified To Use Statistics To Support His Expert Opinions, and His Statistical Analyses Are Sound ..... 2

A. Professor Fischel Is Qualified To Use Statistics ..... 2

B. Professor Fischel's Methodology Is Reliable ..... 6

II. Professor Fischel's Testimony and Well-Reasoned Analysis Will Assist the Trier of Fact ..... 10

III. Professor Fischel's Opinions Have a Firm Factual Basis ..... 11

A. Merrill Lynch's Documents Show a Valuation of More Than $15 for Sunrise REIT ..... 12

B. Morgan Stanley and ING ..... 14

IV. Professor Fischel Should Be Permitted To Offer an Economic (Not Legal) Opinion on the Materiality of Sunrise REIT's Disclosures and on Sunrise REIT's Flawed Sales Process ..... 16

CONCLUSION ..... 20

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2005 WL 88973 (N.D. Ill. Jan. 13, 2005) ....4

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)....4

*Benton v. Ford Motor Co.*, 492 F. Supp. 2d 874 (S.D. Ohio 2007)....5, 10

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009)....2, 10

*Columbia Sec. Litig., In re*, 155 F.R.D. 466 (S.D.N.Y. 1994)....5

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) ....4

*Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993).... 1-2, 8

*Howing Co. v. Nationwide Corp.*, 927 F.2d 263 (6th Cir.), *vacated and remanded*, 502 U.S. 801 (1991)....4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....2

*Laski v. Bellwood*, No. 99-1063, (table), 2000 WL 712502 (6th Cir. May 25, 2000)....2

*Leigh v. Engle*, 669 F. Supp. 1390 (N.D. Ill. 1997)....4, 5

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir. 2000)....12

*MHC Fin. Ltd. P'ship v. City of San Rafael*, Case No. C00-3785 VRW (filed Oct. 13, 2000)....5

*Moore v. United States*, 429 U.S. 20 (1976)....14

*Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998) ....3

*Phillips v. Gates*, No. 07-3515, 2009 WL 1185113 (6th Cir. May 5, 2009), *petition for cert. pending* (U.S. filed July 3, 2009)....12, 14

*Quiet Tech, DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003)....7

*Scrap Metal Antitrust Litig., In re*, 527 F.3d 517 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1673 (2009)....6, 7, 12

*United States v. L.E. Cooke Co.*, 991 F.2d 336 (6th Cir. 1993)..........................................11, 12

**Other Authorities**

John C. Coates, IV, *Empirical Evidence on Structural Takeover Defenses: Where Do We Stand?*, 54 U. Miami L. Rev. 783 (2000) ..........................................................................5

John C. Coates, IV, *Explaining Variation in Takeover Defenses: Blame the Lawyers*, 89 Cal. L. Rev. 1301 (2001) .........................................................................................................5

John C. Coates, IV, *Fair Value as an Avoidable Rule of Corporate Law*, 147 U. Pa. L. Rev. 1251 (1999) ...................................................................................................................5

Frank Easterbrook & Daniel R. Fischel, *The Proper Role of a Target's Management in Responding to a Tender Offer*, 94 Harv. L. Rev. 1161 (1981) ..........................................4

Thomas D. Fields, Thomas Z. Lys & Linda Vincent, *Empirical Research on Accounting Choice*, 31 J. Acct. & Econ. 255 (2001) ...................................................................5

Daniel R. Fischel, *Efficient Capital Market Theory, the Market for Corporate Control, and the Regulation of Cash Tender Offers*, 57 Texas L. Rev. 1 (1978) .............................4

Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Law 1 (1982) ..........................................................3

Daniel R. Fischel, David J. Ross and Michael A. Keable, *The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update Briefly . . . Perspectives on Legislation, Regulation, and Litigation* (National Legal Center for the Public Interest, 2006)..........................................................................3

William H. Greene, *Econometric Analysis* (5th ed. 2003) ...........................................................10

Peter Kennedy, *A Guide to Econometrics* (6th ed. 2008)............................................................10

## INTRODUCTION AND SUMMARY

Professor Daniel R. Fischel is one of the nation's leading scholars on corporations and the financial markets. Based on his expertise and his review and analysis of the facts of this case, he is prepared to testify that (i) Plaintiff's claim that it would have been able to acquire Sunrise REIT at a price of $15 per unit offer is speculative and (ii) the conduct of Defendant HCP, Inc. ("HCP") was beneficial because it reduced the harm to Sunrise REIT unitholders associated with Sunrise REIT's flawed sales process. *See* Fischel Rep. ¶¶ 8-25 (Exh. 1).

Plaintiff Ventas, Inc. ("Ventas") takes a shotgun approach in its effort to exclude some or all of Professor Fischel's testimony stating eight separate grounds. None has merit. Ventas's claims that Professor Fischel is unqualified to use statistics – and that his analysis and conclusions are flawed and lack proper foundation – are entirely baseless and confuse the weight and credibility of his testimony with its admissibility. (Parts I and III, *infra.*) Ventas's claim (Mem. at 14-15 (DN 238)) that Professor Fischel's report "contain[s] no expert analysis" and "simply asserts his conclusions" is easily shown to be false; there is no question that his testimony is based on his specialized knowledge and will assist the trier of fact. (Part II, *infra.*) And Ventas's remaining grounds for excluding certain portions of Professor Fischel's testimony are largely repeats of arguments Ventas has made in other motions *in limine* and, in most instances, are premised on inaccurate characterizations of Professor Fischel's opinions and testimony. (Part IV, *infra.*)

There is no legitimate basis for excluding Professor Fischel's testimony, in whole or in part. Ventas will have a full opportunity to cross-examine Professor Fischel on his qualifications, his analyses, and the factual foundations for his conclusions, and a properly instructed jury will decide the weight to give his testimony. *See Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## I. Professor Fischel Is Qualified To Use Statistics To Support His Expert Opinions, and His Statistical Analyses Are Sound

### A. Professor Fischel Is Qualified To Use Statistics

Ventas claims that Professor Fischel is not qualified "to opine on statistical analysis." DN 238 at 6. But HCP is not offering Fischel as an expert *in statistics*. He is being offered as an expert in mergers and acquisitions, corporate processes and valuations, and the financial markets. The relevant inquiry, therefore, in determining the admissibility of his testimony under Federal Rule of Evidence 702 is whether Professor Fischel will "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert" *in those fields* – not as an expert statistician or econometrician. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009) (expert testimony of a doctor is admissible even though his "diagnosis might not stand up to exacting scrutiny if he were testifying as a research scientist or a chemist"; question is whether he "performed as a competent, intellectually rigorous treating physician" in his analysis).

Professor Fischel has written, lectured, and testified extensively on the use of statistics in analyzing corporate control transactions and stock market pricing. But even if that were not the case, and his proficiency in applying statistics were in doubt, his testimony would still be admissible. The Sixth Circuit has in recent years "given a decidedly more liberal construction of the rules concerning admission of expert witnesses and their ability to testify regarding matters which might not fall within their particular specialty." *Laski v. Bellwood*, No. 99-1063, 2000 WL 712502, at *4 (6th Cir. May 25, 2000) (judgment noted at 215 F.3d 1326 (table)). In

*Morales v. American Honda Motor Co.*, 151 F.3d 500 (6th Cir. 1998), the Sixth Circuit held it permissible to allow an expert in the area of product safety to testify regarding accident reconstruction, engineering, and child psychology "despite the fact that he ha[d] no background in any of these areas" and "lack[ed] . . .familiarity with the given topics," because opposing counsel had "cross examined [the expert] regarding his qualifications to testify in the areas in question" and the jury was instructed "that they were to determine the weight and credibility to be given [the expert's] testimony." *Id.* at 516. Ventas will have that chance here. HCP invites opposing counsel to examine Professor Fischel on his knowledge of statistics, and the jury can decide the weight and credibility to give his testimony.

But there is no serious question that Professor Fischel is competent to use statistical methods in his areas of expertise. Professor Fischel's curriculum vitae is attached here as Exhibit 2, and his qualifications are summarized in paragraphs 1 to 4 of his initial report, *see* Exh. 1. *See* Curriculum Vitae of Daniel R. Fischel (Exh. A to Fischel Rep.) (Exh. 2). Professor Fischel has written and lectured extensively about the use of econometrics (*i.e.*, the application of statistical techniques to economics). He was, in fact, a pioneer in the use of statistical analysis to understand changes in the markets and, in particular, the effect of information (or misrepresentations) on stock market prices. *See*, *e.g.*, Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Law 1 (1982). And his work and academic interest in the use of statistical modeling has continued throughout his acclaimed career. *See*, *e.g.*, Daniel R. Fischel, David J. Ross & Michael A. Keable, *The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update Briefly . . . Perspectives on Legislation, Regulation, and Litigation* (National Legal Center for the Public Interest, 2006).

Federal and state courts at all levels, including the Supreme Court of the United States and the Sixth Circuit, have cited his academic work as authoritative. *See*, *e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 247 n.24 (1988) (citing Fischel and commenting on "the use of sophisticated statistical analysis and the application of economic theory" in the debate on the efficient-capital-market theory); *Howing Co. v. Nationwide Corp.*, 927 F.2d 263, 265 n.1 (6th Cir.), *vacated and remanded on other grounds*, 502 U.S. 801 (1991).[1]

Courts across the country have also found Professor Fischel qualified to testify on issues similar to those presented in this litigation – and he routinely uses statistics to support his opinions. He has been the testifying expert in more than 200 cases and, in a substantial portion of those cases, he has used some form of statistical analysis. No court has ever excluded Professor Fischel's testimony because his statistical methodology was found flawed or unsound.[2] Quite the contrary, his skill in using statistics has been complimented by the courts. For example, in *Leigh v. Engle*,[3] the district court described Professor Fischel's statistical analysis in detail and concluded, "[i]f it is not already apparent, this is an appropriate place to note that the court found Fischel . . . an extraordinarily able witness in terms of the depth and breadth of his

[1] *See also CTS Corp. Dynamics Corp. of Am.*, 481 U.S. 69, 91 (1987) (citing Frank Easterbrook & Daniel R. Fischel, *The Proper Role of a Target's Management in Responding to a Tender Offer*, 94 Harv. L. Rev. 1161 (1981) ("*The Proper Role of a Target's Management*")) and *Edgar v. MITE Corp.*, 457 U.S. 624, 643-44 (1982) (citing Daniel R. Fischel, *Efficient Capital Market Theory, the Market for Corporate Control, and the Regulation of Cash Tender Offers*, 57 Texas L. Rev. 1, 5, 27-28, 45 (1978) and *The Proper Role of a Target's Management* at 1173-74).

[2] *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2005 WL 88973 (N.D. Ill. Jan. 13, 2005) is not to the contrary. In that case, "Plaintiffs d[id] not question the qualifications" of Professor Fischel. *Id.* at *9. Nor did the court conclude that Professor Fischel's methodology was "flawed," as Ventas suggests. The *Abrams* Court concluded only that Fischel would not be permitted to offer one of three opinions in his report, because that one opinion was not "shown to be relevant to issues in the present case" and because "no statistical or other sufficient method for correlating" relevant market effects was provided. *Id.* at *10.

[3] *Leigh v. Engle*, 699 F. Supp. 1390 (N.D. Ill. 1987), *aff'd*, 858 F.2d 361 (7th Cir. 1988).

understanding of this case" and found "his testimony highly credible and persuasive." 669 F. Supp. at 1401; *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 480-81 (S.D.N.Y. 1994) (Fischel is "a noted expert in the application of economic theory to corporate law"; "Plaintiffs do not challenge Fischel's statistical analysis").[4]

Ventas's own experts in this litigation have also acknowledged Professor Fischel's prominence and expertise in the field by frequently citing his work – including his work involving statistics – in their own academic writings. *See*, *e.g.*, John C. Coates, IV, *Empirical Evidence on Structural Takeover Defenses: Where Do We Stand?*, 54 U. Miami L. Rev. 783, 786 & n.10 (2000) (citing Fischel's work on statistical "event studies"); John C. Coates, IV, *Explaining Variation in Takeover Defenses: Blame the Lawyers*, 89 Cal. L. Rev. 1301, 1327 (2001) (Fischel is a "prominent legal academic[]" in the field of corporate control transactions); John C. Coates, IV, *"Fair Value" as an Avoidable Rule of Corporate Law*, 147 U. Pa. L. Rev. 1251 (1999) (citing Fischel throughout); Thomas D. Fields, Thomas Z. Lys, & Linda Vincent, *Empirical research on accounting choice*, 31 J. Acct. & Econ. 255, 261 (2001) (quoting Fischel).

Professor Fischel's qualifications to use statistics are established. Ventas will have its opportunity to challenge those qualifications at trial, and the jury can decide the weight and credibility to assign his testimony. Ventas's "argument opposing admissibility of the testimony on the grounds that it is outside the witness's area of expertise must fail." *Benton v. Ford Motor Co.*, 492 F. Supp. 2d 874, 877 (S.D. Ohio 2007) ("To be sure, the Sixth Circuit agrees that, where the opposing side has the opportunity to cross-examine an expert regarding his qualifications and where the jury is properly instructed to determine for itself the weight and

---

[4] Ventas's counsel, Jenner & Block, retained Professor Fischel (and relied on his statistical capabilities) in the *Leigh* case, and has retained Fischel in other matters. *See*, *e.g.*, *MHC Fin. Ltd. P'ship v. City of San Rafael*, Case No. C 00-3785 VRW (N.D. Cal. filed Oct. 13, 2000) (lead counsel David Bradford).

credibility to be given to the expert's testimony, an argument opposing admissibility of the testimony on the grounds that it is outside the witness's area of expertise must fail.").

**B. Professor Fischel's Methodology Is Reliable**

Ventas purports to find three errors in how Professor Fischel calculated the arbitrage spread and probability model in his reports. DN 238, at 6-12. Ventas starts, however, from the false and misleading premise that "Professor Fischel relies on [these] statistical models . . . to reach an opinion that Ventas cannot demonstrate that it would have acquired Sunrise REIT at a price of $15 per unit." *Id.* at 6. But it is plain from his report – and was underscored during his deposition – that Fischel is *not* relying on a risk-arbitrage analysis or probability analysis to support his conclusion that Ventas's claim that it would have been able to acquire Sunrise REIT at $15 per unit is speculative. *See* Fischel Rep. ¶¶ 8-20; *see, e.g.*, Fischel Dep. 163:14-164:16, 169:05-11 (Exh. 3). Those two statistical models were used *by Ventas's expert*, Thomas Lys. *See* Lys Rep. ¶¶ 77-88 (DN 238, Exh. 5). Professor Fischel merely applied Lys's statistical models to other transactions to illustrate Lys's flawed methodology and the overreaching nature of his conclusions.

Moreover, this entire argument "fundamentally confuses the *credibility and accuracy* of [Fischel's] opinion with its *reliability*." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1673 (2009). It is well settled that an attack on an expert's application of an accepted study or method "goes to the weight of the evidence, rather than to its admissibility." *Id.* at 530. In *Scrap Metal*, the Sixth Circuit explained that alleged flaws in the "specific application" of a methodology – *e.g.*, claims that "the expert used incorrect data or was missing data . . . [or] used the wrong equations to run the analysis" – are not generally a basis for excluding the expert's testimony as inadmissible. *Id.* "'The identification

of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.'" *Id.* (quoting *Quiet Tech, DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003)).

Ventas's three specific attacks on Professor Fischel's analyses are likewise without merit. *First*, Ventas is wrong in claiming (DN 238, at 9) that an arbitrage analysis measuring forward from the date that each transaction was announced "is not the proper methodology." In fact, one of the two articles that Ventas cites *uses an announcement date*, as well as a completion date, in its research on arbitrage analysis. *See id.* Exh. 7, at 489 (showing that "looking forward from the announcement date and backward from the conclusion date" are both acceptable methods). Ventas is also wrong in claiming (at 9) that Fischel "failed to utilize completion date[s]." Professor Fischel used both announcement dates and completion dates in his analysis. *See*, *e.g.*, Fischel Rebuttal Exh. Q (results based on "Withdrawal Date" and "Announcement Date") (Exh. 4); *id.* Exh. R. (results based on "Completion Date" and "Announcement Date").

It is Professor Lys who used only one date for measurement (counting backward from an end date), and arguably biased his results in doing so. Professor Lys compared arbitrage spreads in "successful" and "failed" transactions in an effort to predict the likelihood that Ventas's $15 offer would have succeeded or failed. In a "failed" transaction, however, there is by definition no "completion date." Professor Lys therefore used instead the date that a transaction was withdrawn. But he fails to account for obvious differences in time periods – a transaction may be (and often is) "withdrawn" before the date the transaction is scheduled to be completed. *See* Fischel Rep. ¶¶ 20-21. By measuring forward from the announcement date (as Fischel did and as is an accepted method in the academic literature), "successful" and "failed" transactions are treated symmetrically.

Basing the analysis on announcement dates also makes more sense under the circumstances of this case. Both experts are considering whether there is economic evidence to predict what would have happened on Ventas's $15 offer in the absence of HCP's topping bid on February 14. And both experts agree that, for purposes of any arbitrage spread analysis, we have only the period from January 14 to February 14 to consider. Therefore, using Ventas's road-race analogy, we have only "the first 100 yards" of a scheduled race to observe in order to predict the winner. DN 238, at 9. In the but-for world in which causation and damages are determined, we do not know with certainty when or whether the Ventas/Sunrise REIT $15 offer would end (*i.e.*, be completed or withdrawn) – that is, of course, part of the question the experts are trying to answer. Therefore, "the finish line" in our race analogy is uncertain, while measuring from the starting line is known and reliable.[5]

*Second*, Ventas seeks to exclude certain "negative arbitrage calculations" contained in Professor Fischel's rebuttal report. *Id.* at 10. Professor Fischel applied an arbitrage spread analysis to Professor Lys's own sample of 28 "withdrawn" offers and, for many transactions, the model produced a negative number. Here, Ventas is not challenging *the reliability* of the methodology that Professor Fischel used (both experts use the same statistical formula); Ventas is challenging *the outcome* of that methodology. That is not a proper basis for excluding the testimony. *See Daubert*, 509 U.S. at 594-95 ("The focus . . . must be solely on principles and

[5] Ventas claims that counting backward from the completion or withdrawal date is necessary to "ensure[] that the time value of money is accounted for consistently across different transactions which pend approval for different temporal durations." DN 238, at 8. However, Professor Lys explicitly does *not* account for the time value of money in his risk arbitrage analysis. *See* Lys Report ¶ 78 n.114 (DN 238, Exh. 5) [redacted] Furthermore, his calculation of arbitrage spreads for 385 transactions in Exhibit 8 to his report do not account for time value of money effects either.

methodology, not on the conclusions they generate.").[6] Moreover, even if the transactions that resulted in a negative arbitrage spread were ignored, Fischel's point remains: a substantial portion of transactions that are known to have "failed" (7 transactions of 28 or 25%) have an arbitrage spread in the range (0 to approximately 2) that, under Lys's theory, should "reliably predict successful completion." DN 238, at 10. Ventas is simply trying to exclude expert testimony that shows Lys's arbitrage model is not in fact an accurate predictor of outcomes.

*Third*, Ventas's complaint about Professor Fischel's application of Lys's probability model also challenges only his outcome; Ventas does not – and cannot – cite any error in how Fischel applied Lys's probability formula. Ventas just does not like the *results* produced when Professor Fischel applies the model to other transactions, and the weaknesses of Lys's model are exposed.

Ventas claims that Lys "manually" constrained his results to ensure that his model did not produce probabilities exceeding 100%. *Id.* at 11. But it is undisputed that Lys's probability equation does not itself contain any limitation that would prevent probabilities from exceeding 100%. And Professor Lys performed only one calculation using that probability model – the $15 offer for Sunrise REIT – which, it so happened, did not result in a probability over 100%. Lys Rep. ¶ 88 n.121 (DN 238, Exh. 5). Therefore, Professor Fischel's demonstration that Lys's methodology produces nonsensical results when applied to transactions other than Ventas's $15 offer is not evidence of flaws in Fischel's methodology, but in Lys's own. Indeed, the academic

[6] Ventas is also missing the point: A very low but positive arbitrage spread may indicate that the transaction will go through with high probability *or* it may be a weighted average of a high arbitrage spread because of the chance that the transaction will fall through and a negative arbitrage spread because of the probability of a topping bid. It is ridiculous to say that if the model has an arbitrage spread of +$0.01/share, there is a 99% chance that the transaction will succeed, but if the spread changes by a miniscule amount to −$0.01/share the model now expects the transaction to fail. A point of the Fischel analysis is to show that a small change in the stock price results in a breakdown of the model.

literature criticizes the use of probability models for the same reasons given by Professor Fischel in his deposition: they [redacted] Fischel Dep. 67:08-09. *See*, *e.g.*, Peter Kennedy, *A Guide to Econometrics* 242 (6th ed. 2008) ("Although this [linear probability] model is often used because of its computational ease, many researchers feel uncomfortable with it because outcomes are sometimes predicted with certainty when it is quite possible they will not occur.") (Exh. 5); William H. Greene, *Econometric Analysis* 666 (5th ed. 2003) ("The linear probability model has a number of shortcomings. . . . A more serious flaw is that without some ad hoc tinkering with the disturbances, we cannot be assured that the prediction from this model will truly look like probabilities. . . . Such a model produces both nonsense probabilities and negative variances. For these reasons, the linear model is becoming less frequently used except as a basis for comparison to some other more appropriate models.") (Exh. 6).

In sum, all of Ventas's complaints about Professor Fischel's applications of Lys's own methodologies can be explored through cross-examination at trial. Although Ventas has identified no errors in Fischel's methodology, "[a]ny weaknesses in [his] methodology w[ould] affect the weight that his opinion is given at trial, but not its threshold admissibility." *Best*, 563 F.3d at 181-82 ("Admissibility under Rule 702 does not require perfect methodology."). *See also Benton*, 492 F. Supp. 2d at 878 (party "would be well served to make its arguments regarding [the expert's] use of statistics to the jury, or, better yet, to offer testimony of an expert who uses statistics that it finds to be more sound").

## II. Professor Fischel's Testimony and Well-Reasoned Analysis Will Assist the Trier of Fact

Ventas also asks the Court to exclude Professor Fischel's entire opening report on the ground that Professor Fischel "simply asserts his conclusions" and "provides no expert analysis." DN 238, at 14-15. HCP is mystified by that claim because any reading of the report will

demonstrate the claim to be untrue. The report provides the detailed reasoning that underlies each opinion and provides citation for each factual assertion. The report provides, among many other things,

- an analysis of potential unitholder votes in the but-for world, *see* Fischel Rep. ¶¶ 10-12 and Exh. C;
- an analysis of Sunrise REIT's stock prices and how the stock price both would react knowing of HCP's willingness to pay more and would reflect all information available to market participants in an efficient stock market, *see id.* ¶¶ 17-19 and Exh. D;
- an analysis of topping bids in other transactions made after companies have entered into merger agreements, *see id.* ¶ 22 and Exh. G; and
- the range of values that Merrill Lynch placed on Sunrise REIT, *see id.* ¶ 23 and Exh. H.

Ventas appears to complain that Professor Fischel did not perform his own "valuation analysis" for Sunrise REIT. DN 238, at 14-15. None was required, in part because Ventas's own financial advisor (Merrill Lynch) produced several valuation analyses – which Professor Fischel was able to review and analyze – during the events at issue, and these contemporaneous valuations apparently reflected the "best thinking" of Ventas and others involved in the transaction. *See* discussion below of Merrill Lynch's valuations, *infra* pp. 12-14 and Exhs. 7, 9.

Professor Fischel's opinions, based on his "technical[] or other specialized knowledge" in the fields of mergers and acquisitions, corporate valuations and processes, and the financial markets, "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Ventas has offered no legitimate ground for excluding them. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993) ("Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact.").

## III. Professor Fischel's Opinions Have a Firm Factual Basis

Ventas seeks to preclude Professor Fischel from offering two particular opinions for lack

of a proper factual foundation. A court "will generally permit [expert] testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Scrap Metal*, 527 F.3d at 530. "[W]here the opinion [of an expert] has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis." *L.E. Cooke*, 991 F.2d at 342. "[M]ere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (internal quotation marks omitted).

Professor Fischel's opinions have more than adequate basis in fact.

### A. Merrill Lynch's Documents Show a Valuation of More Than $15 for Sunrise REIT

It is simply wrong to say "there is no evidence in this case that Merrill Lynch ever valued Sunrise REIT at more than $15 per unit before April 2007," DN 238, at 12. There are many documents showing that Merrill Lynch, which acted as Ventas's financial advisors on the Sunrise REIT transaction [redacted] Ventas's effort to expunge those documents through a post-hoc declaration from Merrill Lynch banker Alan Hartman – a declaration that is contrary to Hartman's deposition testimony and contrary to the documents themselves – *at best* creates a disputed issue of fact for the jury.[7] *See L.E. Cooke*, 991 F.2d at 342 ("The Federal Rules of Evidence allow an expert great liberty in determining the basis of his opinions and whether an expert opinion should be accepted as having an adequate basis is a matter for the trier of fact to decide.").

[7] As of this date, Mr. Hartman does not appear on Ventas's witness list. Therefore, there is no basis to believe that even statements akin to those he made in his out-of-court declaration will be presented as evidence to the jury. The declaration itself is inadmissible. *See Phillips v. Gates*, No. 07-3515, 2009 WL 1185113, at *6 (6th Cir.), *petition for cert. pending* (U.S. filed July 3, 2009) (No. 09-151).

Merrill Lynch made a series of presentations to Ventas's Board of Directors containing valuations for Sunrise REIT using many standard valuation techniques. Those valuations are summarized in Exhibit H to Professor Fischel's initial report. *See* Fischel Rep. ¶ 23 and Exh. H. Other examples of Merrill Lynch valuing Sunrise REIT at more than $15 per unit include:

***Merrill Lynch's Valuation and $16 Fairness Opinion.*** On January 14, 2007, the night Ventas made its $15 offer, Merrill Lynch prepared a valuation analysis for Ventas's Board of Directors. *See* DX 603 (ML 0061949-0061950, ML 0061951R-1986R[8]) (Exh. 7). That valuation presentation – which according to Merrill Lynch, [redacted] depending on the methods and assumptions used by Merrill Lynch (ML 0061949, ML 0061952R, ML 0061969R, and ML 0061970R). Hartman testified during his deposition that [redacted] Hartman Dep. 251:07-253:20 (Exh. 8).[9]

[redacted]

---

[8] Because Ventas's expert, Professor Lys, professed an inability to read the small print on Merrill Lynch's presentation, HCP obtained from Merrill Lynch a copy of the valuation presentation with larger and more legible print. That copy is labeled ML 0061951R-1986R.

[9] Ventas's expert, Professor Lys, recognized the document as [redacted] and confirmed that the [redacted] Lys Dep. 314:15-21, 316:10-12. Although Professor Lys later claimed that it was not a "reliable" or "serious" valuation, he pointed to no flaw in the valuation itself. He merely assumes [redacted] *Id.* 319:06-320:21, 321:22-322:01.

[redacted] Again, Ventas's own expert confirmed that these were [redacted] Lys Dep. 340:02-03 (Exh. 10). [redacted] ML 0023435R, ML 0023436R.

More than a month ***after*** Professor Fischel filed his initial report, and long after he was deposed in this case, Hartman signed a declaration claiming, inexplicably, that [redacted] and that Professor Fischel's summary – which computed the mathematical average of the five valuations' methodologies in Merrill Lynch's Board presentations – was, [redacted] Hartman's out-of-court declaration is hearsay and thus inadmissible at trial. *See Moore v. United States*, 429 U.S. 20, 21 (1976); *Phillips*, 2009 WL 1185113, at *6. And it appears, at the moment, that Hartman will not be appearing at trial. But even assuming he does appear, and assuming he testifies at trial to the statements contained in his declaration, that would, at most, create an issue of fact for the jury to decide. It certainly would not be a basis to exclude Professor Fischel's opinions which have a firm factual basis in Merrill Lynch's own documents.

**B. Morgan Stanley and ING**

Ventas claims that there is no factual basis for HCP or Professor Fischel to contend that Sunrise REIT's largest unitholders – Morgan Stanley and ING – would have voiced their opposition to Ventas's $15 offer "publicly." DN 238, at 13. The short answer to that strawman is that these unitholders did not need to state their opposition *publicly* in order to defeat Ventas's proposal. As Fischel explains in his reports, the ownership interests of these two unitholders was

so large that together they had enough votes to block the $15 bid without enlisting the support of other unitholders. *See* Fischel Rep. ¶¶ 10-12 & n.7; Fischel Rebuttal ¶ 7 and Exh. J ("even if only [Morgan Stanley] and ING would have voted against Ventas' C$15 offer, the transaction would not have been approved"). Ventas does not and cannot challenge those facts.

However, it is not "speculative" to believe that these major shareholders would have voiced their opposition and that their opposition would have persuaded other Sunrise REIT unitholders. Sunrise REIT's bankers, TD Securities, for instance, recognized the influence of the top unitholders like Morgan Stanley and ING, and knew their support (or opposition) [redacted] along. DX 805, at TDS 046786 (Exh. 11). Among the ample evidence that the unitholders talked among themselves and their decisions would have persuaded other investors are the following email communications:

- From Sunrise REIT CEO to TD Securities: [redacted] DX 1150 (Exh. 12).
- Between bankers at TD Securities: [redacted] TDS 046491 (Exh. 13).
- From a TD banker to Sunrise REIT's Chairman: [redacted] DX 1133 (Exh. 14).

- [redacted] MCK 0001748 (Exh. 15).

It is not surprising that those involved in the transaction were concerned about the influence of the major unitholders: once a major shareholder has expressed opposition to a transaction, it becomes less likely that the transaction will be successfully completed at or below the initial offer price. *See* Fischel Rebuttal ¶ 15 and Exh. L.

## IV. Professor Fischel Should Be Permitted To Offer an Economic (Not Legal) Opinion on the Materiality of Sunrise REIT's Disclosures and on Sunrise REIT's Flawed Sales Process

The remainder of Ventas's motion is largely a repeat of arguments made in Ventas's Pretrial Motions No. 1 and No. 2, in which Ventas seeks to prohibit testimony and evidence regarding the flawed sales process and different standstill provisions (Motion No. 1) and to exclude testimony regarding Sunrise REIT's disclosure obligations under Canadian law (Motion No. 2). *See* DN 238, at 2-5, 13-14. HCP addresses those arguments, all of which are meritless, in its responses to those motions.

To the extent those issues bear on Professor Fischel's testimony, Ventas misunderstands (or is mischaracterizing) his opinions in five important respects:

**1.** Regarding the news of HCP's willingness to pay a higher price for Sunrise REIT, Professor Fischel is *not* offering a legal opinion that HCP's prior offer of $16.25 "should have been disclosed by Sunrise REIT" to comply with Canadian law. DN 238, at 3. Professor Fischel is offering an opinion regarding the materiality of that information to the unitholders in an economic sense. His deposition testimony could not have been more clear:

[redacted]

Fischel Dep. 72:16-73:17.

**2.** Nor is it accurate to say that "Professor Fischel concludes the Ventas $15 transaction would not have been approved because market participants would have known that HCP was supposedly willing to pay a higher price." DN 238, at 2. Indeed, Ventas acknowledges elsewhere in its brief that Fischel's "report carefully *stops short* of opining that the transaction would not have been approved," *id.* at 14 (emphasis added), though Professor Fischel opines that [redacted] that the $15 offer would be approved given the position of Morgan Stanley and ING, *see* Fischel Dep. 243:13-15. Professor Fischel also stated plainly that he is expressing no opinion on whether, *as a factual matter*, market participants would have learned of HCP's offers during the initial phase of the sales process:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Fischel Dep. 74:13-76:02 (emphasis added). Professor Fischel is opining only that, [redacted] *Id.* at 76:08-09.

**3.** While at once arguing vigorously to stop HCP (and Professors Nicholls and Fischel) from saying that HCP's willingness to pay more would have become known, Ventas also argues in the same breath that Professor Fischel should not be allowed to say that Ventas's case is based on the suppression of this truthful information. It is Fischel's expert opinion that "*if* HCP's willingness to pay more was known to participants," "Ventas cannot demonstrate that Sunrise REIT unitholders would have approved the transaction at C$15 per unit." Fischel Rep. ¶ 16 (emphasis added). "This conclusion remains true regardless of how Sunrise REIT unitholders learned of HCP's willingness to pay – whether as a result of a public disclosure by Sunrise REIT of the negotiating history between the parties during the auction, a public disclosure by HCP of its willingness to pay without a formal offer, or a formal acquisition offer like HCP actually made." *Id.*

Ventas does not challenge the critical point: if a higher offer were known, its $15 deal would fail. Nor could it. Ventas has conceded elsewhere that, once the unitholders believed that HCP was willing to pay $18, [redacted] – unitholders would not approve

the $15 offer. Cafaro Dep. 286:05 (Exh. 16). It is perfectly proper and accurate, then, for Professor Fischel to testify that Ventas cannot prove that Sunrise REIT's unitholders would have approved $15 – as it must to prevail in this case – unless HCP's expressed willingness to pay more was somehow suppressed. It is for the jury then to decide whether, in fact, HCP's willingness would (or should) have become known to the unitholders in the absence of the February 14 topping bid.

**4.** Ventas claims that *res judicata* and collateral estoppel preclude Professor Fischel from discussing the flawed sales process that was caused, in part,[10] by the parties' different standstill provisions. The Court will recall, however, that, in denying HCP leave to file a second amended counterclaim, the Court expressly stated that, by precluding HCP's *claims* based on the different standstills and unfairness of the sales process, the Court was "*not* . . . preclud[ing] HCP from using the issues presented in their counterclaim *to defend* against Plaintiff's claim for tortious interference." DN 186, at 12 (emphases added). The Court explained further: "HCP may still argue that it was entitled to act as it did given the full facts of the situation" and the "Court's present order in no way precludes HCP from arguing the facts presented in the second amended counterclaim. " *Id.* The "full facts" include the different standstill provisions and flawed and unfair sales process, and HCP should be permitted to provide expert testimony based on those facts. Furthermore, Professor Fischel's testimony about the impact on shareholders of flaws in

[10] Ventas asserts (DN 238, at 4) that "the only basis" for Professor Fischel's opinion that the sales process was flawed was the different standstills for different bidders. Professor Fischel made clear in his deposition that, while the different standstills was the [redacted] that were flaws in the process. Fischel Dep. 282:14-20. As explained in paragraphs 23 and 24 of Fischel's initial report, the sales process was flawed because $15 was less than the amount that Ventas and HCP were willing to pay and less than Merrill Lynch's valuations. The sale process failed in the most fundamental way possible – it did not maximize the value to unitholders.

the sales process design does not imply or depend on the legal significance of Sunrise REIT's actions.

**5.** Ventas asks the Court to preclude any expert testimony on whether HCP's topping bid was "beneficial" to Sunrise REIT unitholders, claiming that Professor Fischel's testimony in this regard is nothing more than an opinion that "$16.50 is more money than $15." DN 238, at 13-14. That is inaccurate. Although Fischel is not opining that HCP's topping bid was beneficial *to society at large*, it is his expert opinion that the conduct was beneficial *to Sunrise REIT unitholders* because the $16.50 higher price was [redacted] Fischel Dep. 281:15-282:08. The $16.50 that Ventas ultimately paid was not simply a higher monetary price; that higher price partially corrected the circumstances that had harmed those unitholders.

**CONCLUSION**

For these reasons, Plaintiff's motion to exclude some or all of Professor Fischel's testimony should be denied. A proposed order is tendered herewith.

Respectfully submitted,

/s/ Sheryl G. Snyder
*Counsel for Defendant HCP, Inc.*

Sheryl G. Snyder
Theresa A. Canaday
Tanya Y. Bowman
FROST BROWN TODD LLC
400 W. Market Street, 32nd Floor
Louisville, Kentucky 40202
(502) 589-5400
(502) 581-1087 (facsimile)

and

Mark C. Hansen (pro hac vice)
Aaron M. Panner (pro hac vice)
Courtney S. Elwood (pro hac vice)
James M. Webster, III (pro hac vice)
Brendan J. Crimmins (pro hac vice)
W. David Sarratt (pro hac vice)
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (facsimile)

August 13, 2009

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 13th day of August, 2009, I electronically filed the foregoing HCP, Inc.'s Opposition to Ventas, Inc.'s Pretrial Motion No. 8 To Exclude Testimony of Daniel R. Fischel with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to ECF registered participants.

/s/ Sheryl G. Snyder
*Counsel for Defendant HCP, Inc.*