UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:07-CV-238-H

VENTAS, INC.                                                                PLAINTIFF

V.

HCP, INC.                                                                        DEFENDANT

**MEMORANDUM OPINION**

The parties expertly tried this case to a jury for nearly three weeks and that jury returned a significant verdict in favor of Plaintiff, Ventas, Inc. Specifically, the jury found that Plaintiff, which had entered a deal subject to unitholder approval to purchase Sunrise REIT, a healthcare real estate investment trust, for $15 per unit, had a valid expectation that deal would be approved and that Defendant, HCP, Inc., acted in a significantly wrongful manner that improperly interfered with Plaintiff's valid business expectation.[1] The jury awarded Plaintiff compensatory damages of over $101,000,000.00. Defendant now moves this Court for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, alternatively, a new trial under Rule 59. Additionally, the parties jointly move the Court to supplement the record with certain documents and Plaintiff moves to amend the judgment.

The Court recognizes that this case and its trial presented very close, challenging and hotly contested issues of fact and law. Although reasonable people could have examined the evidence and come to different conclusions than the one this jury reached, the Court believes that

---

[1] A more detailed analysis of the facts of this case can be found in the Court's previous opinions.

1

sufficient evidence supported the jury's conclusions. The Court has already addressed many of the issues Defendant raises, either in other Memorandum Opinions or at trial. Upon reconsideration, the Court stands by its previous rulings and will not repeat itself except as needed. None of the other claimed errors justifies the relief requested. Overall, the Court concludes that the parties received a fair trial.

## I.

Defendant's first and most fundamental argument is that Plaintiff failed to prove HCP used significantly wrongful means in interfering with Plaintiff's business expectancy. The Court instructed the jury under Kentucky law that significantly wrongful conduct required conduct such as fraudulent misrepresentation, deceit and coercion. Defendant does not argue that this is an incorrect statement of the law. Rather, Defendant asserts that the language of the press release it submitted was entirely truthful and no reasonable person could find that it was misleading. This is a purely factual dispute and so long as sufficient evidence existed for a reasonable juror to find in Plaintiff's favor, the Court cannot reverse the jury's decision. *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). There is no doubt that one could view the evidence from different perspectives.

In the end, Plaintiff convinced the jury to filter the evidence from its perspective. The press release included language indicating that Defendant's proposal was "identical" to the Plaintiff's that it was a "superior proposal" and that there was a "greater certainty of completion" than Plaintiff's deal. The jury could easily find these statements were false and misleading. Evidence showed that Defendant's deal was conditional and Defendant did not list those conditions in its press release. Moreover, evidence indicated that there was no certainty of

success on the deal and, in fact, Canadian courts later found that Defendant could not legally submit the offer. This evidence allowed a reasonable juror to determine that Defendant's actions constituted fraudulent misrepresentations. As Kentucky's then-highest court held, "causing a false impression constitutes a palpable fraud, even though the statement is true as far as it goes, since such concealment is in fact a false representation of that which is disclosed." *Dennis v. Thomson*, 43 S.W.2d 18, 23 (Ky. 1931).

In addition to the misleading press release, Plaintiff presented evidence, such as lying about sending a signed, unconditional offer to Sunrise REIT and failing to ever publicly correct its press release, which would support the conclusion that Defendant intended to mislead the public. This evidence, too, supports the jury's determination that Defendant acted with significantly wrongful means. The combination of this evidence permits the jury's conclusion that the press release was misleading and deceitful. Defendant presented plausible but ultimately unpersuasive explanations.

Perhaps most importantly, the Court believes that the jury might well have placed significant reliance on the testimony of Mr. Michael Warren, who stated that he had never seen the type of tactics utilized by Defendant in his thirty years of business experience and that he was "flabbergasted" by Defendant's behavior. Mr. Warren was a particularly impressive witness who presented himself almost as an independent observer of events. The jury is the proper decision-maker on issues of credibility and importance of the evidence. Combined with the other relevant evidence, the testimony of Mr. Warren allowed the jury to find that Defendant's actions were significantly wrongful. The fact that plenty of evidence could also suggest a different result does not change the validity of the jury's conclusions.

## II.

Second, Defendant argues that there was no evidence of causation. This was certainly a difficult issue throughout the case, but the jury determined that the significantly wrongful conduct of Defendant, and not some other force, caused the interference with Plaintiff's reasonable business expectancy of acquiring Sunrise REIT at $15 per unit. The Court believes that the jury's decision was reasonable in light of the evidence and will not overturn it.

Primarily, Defendant argues that had just the truthful portion of its press release gone public - that Defendant was willing and able to pay $18 per unit for Sunrise REIT - the result would have been the same as the press release going public with misleading information. While this is certainly a reasonable possibility, it is not the only reasonable possibility. Plaintiff presented expert testimony that had all the conditions of the $18 offer been made public initially, including the standstill agreement that likely prohibited consideration of the offer, the raise in the stock price would not have been as significant and the unitholder base would not have changed so dramatically. If that were the case, the damage to Plaintiff's expectancy would likely not have occurred.

Defendant also argues that causation was not proven because the "truth" about the $18 offer was on the market long before any unitholder vote ever would have occurred. Thus, according to Defendant, there was no damage from any misleading statements. However, Plaintiff presented evidence that the misleading statements, especially the language that the deal at $18 had a great certainty of getting done, caused an entirely new unitholder base. In fact, it is undisputed that within 48 hours of Defendant's press release, over forty million shares changed hands. Plaintiff presented evidence that such a change meant the new uniholders had little to no

incentive to accept a $15 bid, even after it became clear Defendant's bid would not be considered. The jury could reasonably decide that in the absence of this market shift, which it decided was caused by Defendant's significantly wrongful conduct, Plaintiff's $15 offer would have been approved.

**III.**

Defendant next argues that Plaintiff's claim was barred in its entirety by res judicata. Defendant has raised this issue twice before. The Court paid considerable attention to the issue both times before rejecting it. (DN # 34 & 220.) The Court found that Plaintiff was not required to bring this action as a part of previous Canadian litigation because that litigation occurred before Plaintiff's injury ripened. Defendant now argues that Plaintiff claimed at trial its injury had occurred as soon as the press release was made, which was before the Canadian litigation. However, as this Court previously found,

> At the time of the Canadian proceedings in late February and early March, 2007, the conduct ultimately alleged to be tortious may have occurred, but no harm had yet befallen Plaintiff. . . . [U]ntil Plaintiff actually paid more for its acquisition of Sunrise REIT than originally anticipated in the Purchase Agreement . . . it could not be said that any damage had occurred.

(DN # 34 at 5.) For the reasons set forth in that Memorandum Opinion, the Court reaffirms its decision that res judicata does not bar Plaintiff's claim.

**IV.**

Alternatively, Defendant requests a new trial because the verdict was against the clear weight of the evidence. Largely, Defendant relies on the testimony of executives from Morgan Stanley and ING, the two largest unitholders of Sunrise REIT, that they likely would not have approved Plaintiff's $15 per unit deal even if Defendant had never announced an $18 deal. Once

5

again, Defendant makes arguments that could have convinced the jury, but did not.

While it is certainly true that without approval from one of these two companies the deal could not have gone through, it was for the jury to determine the credibility of the Morgan Stanley and ING testimony. Plaintiff presented ample evidence that the $15 per unit offer was a good price and significantly more than any unitholder had ever paid for Sunrise REIT units. Moreover, the testimony of Morgan Stanley's representative, Mr. Bigman, could have been interpreted as equivocal and his demeanor during examinations may have permitted the jury to reasonably doubt his credibility. Given the credibility questions raised by the testimony and the evidence presented by Plaintiff, the weight of the evidence was sufficient to support the jury's decision and no new trial is required.

## V.

A new trial is also requested based on alleged prejudicial errors in the jury instructions.[2] As this Court has stated,

> Jury instructions must "adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." A jury verdict will be reversed on account of improper instructions "only if the instructions, when viewed as a whole, were confusing, misleading and prejudicial."

*Burke v. U-Haul Intern., Inc.*, 501 F. Supp. 2d 930, 935 (W.D. Ky. 2007) (quoting *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 787 (6th Cir. 2003)). Before examining the specific allegations of Defendant, the Court makes two observations. First, the instructions,

---

[2] There has been some discussion in the briefing related to the preliminary drafts of the instructions shared with counsel prior to giving the final instructions to the jury. Given the complex nature of this case, the Court believed that allowing the parties to weigh-in on the proper drafting of the instructions at all relevant stages was more beneficial than simply examining the initial requests made by the parties. However, those preliminary drafts were never shared with the jury. Only the final instructions were given to the jury and only those instructions can be the basis for any error.

for the most part, represented the substance of the instructions that Defendant requested. Second, the Court previously issued a Memorandum Opinion detailing the reasoning for the instructions selected and the Court reaffirms that Memorandum Opinion. (DN # 450.)

**A.**

Defendant first contends that the Court erred in failing to instruct the jury that it found, as a matter of law, that Defendant acted maliciously. Under Kentucky law, improper interference can be shown in one of two ways: (1) the defendant acted maliciously, or (2) the defendant acted with significantly wrongful means. *NCAA v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988). To establish malice as it is used in the tort of improper interference, the plaintiff must show that the defendant acted for the *sole purpose* of harming the plaintiff. The Court held as a matter of law that Defendant did not act for the *sole purpose* of harming Plaintiff. Thus, the Court did not instruct the jury on this issue, but rather instructed the jury that to find improper interference it had to find Defendant acted with significantly wrongfully means. Defendant now complains that the Court was required to instruct the jury that it found Defendant did not act maliciously.

Defendant is correct that the Court's pre-trial instructions to the jury identified malice as a possible basis for improper interference. However, the Court also instructed the jury that the final instructions may change from those original instructions. Instead of specifically telling the jury that the Court found Plaintiff failed to meet its burden to show malice, which may have unfairly prejudiced Plaintiff, the Court simply omitted malice from the instructions. This omission helped ensure the jury was not confused by an issue that was no longer in the case. Moreover, it complied with Kentucky's bare bones approach to jury instructions. "[J]ury instructions should not contain an abundance of detail, but should provide only the bare bones of

7

the question for jury determination." *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000). The *only* question for jury determination was whether Defendant's conduct was significantly wrongful, so the Court instructed only on that issue. It was not error to do so.

Defendant's primary complaint with regard to the malice instruction is that the Court also instructed the jury that it was permitted to consider Defendant's motive in deciding whether Defendant's conduct was wrongful. Because the Court determined Defendant did not act for the *sole purpose* of harming Plaintiff, Defendant contends its motives were necessarily proper and the Court should not have permitted the jury to consider Defendant's motives with respect to the significantly wrongful means analysis of improper interference. Defendant misunderstands the effect of the Court's ruling. Simply because Defendant's *sole purpose* was not to harm Plaintiff does not mean that Defendant's motives were irrelevant. Rather, it could have been part of Defendant's intent to cause harm to Plaintiff and such intent certainly makes it more likely Defendant's conduct was significantly wrongful. As explained in the Court's Memorandum Opinion addressing the jury instructions (DN # 450), Restatement (Second) of Torts § 767 specifically lists the party's motive as a proper consideration for finding improper interference and those factors provide guideposts for the jury even where the improper interference is between competitors.[3]

**B.**

Defendant has other issues with the Court's instructions concerning the Court's handling of the Canadian litigation. The Court devoted considerable attention to resolving these issues

---

[3] Defendant also contends that Plaintiff argued the malice theory in its closing argument and that requires a new trial. However, as the Court has previously held, Plaintiff's arguments were within the bounds of the law and Plaintiff focused his argument on motive as it implies significantly wrongful conduct.

8

prior to trial and handling them during trial.

First, Defendant argues that the Court prejudicially erred in instructing the jury that Defendant's breach of contract could be considered as evidence of significantly wrongful conduct. Canadian Courts previously found that Defendant breached its standstill agreement with Sunrise REIT when it submitted its $18 topping bid. Throughout the trial, Defendant maintained that its breach of contract could not constitute improper interference and, in fact, could not be considered in determining whether Defendant's conduct was significantly wrongful. While the Court agrees with Defendant that breach of contract itself cannot constitute improper interference, Defendant has offered no authority stating that the jury could not consider it. Indeed to ignore the fact of a court determined breach would create an artificial reality within the case.

The Court concluded that the jury should be able to consider all events relevant to HCP's conduct. The few courts to consider the issue agree that the breach of contract is relevant. *See Island Air., Inc. v. LaBar*, 566 P.2d 972, 980 (Wash. Ct. App. 1977) (considering breach of contract as relevant in finding improper interference between competitors); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 309 (Utah 1982) ("A deliberate breach of contract, even when employed to secure economic advantage, is not, *by itself*, an 'improper means.' . . . Neither a deliberate breach of contract nor an immediate purpose to inflict injury which does not predominate over a legitimate economic end will, by itself, satisfy this element of the tort. *However, they may do so in combination*.") (emphasis added). The Court's instructions

9

complied with these legal principles.[4]

Defendant also contends that the Court's instruction on other Ontario court rulings were improper as was the Court's exclusion of certain evidence based on the Ontario proceedings. This was a difficult issue throughout the case. However, the court has previously ruled on the effect of the Canadian litigation (*see* DN # 34 & 220) and the instructions complied with those rulings. These instructions were necessary to prevent juror confusion.[5]

## C.

Causation is the next instruction to which Defendant objects. Defendant contends that the Court should have been more specific in its instruction regarding the "but-for" element of tortious interference. However, the Court instructed the jury, as Defendant requested, that the significantly wrongful conduct of Defendant must have been the "but-for" cause of Plaintiff's injuries for Plaintiff to succeed. The Court then defined this term by stating, "This but for test means that if HCP's improper interference had never occurred, Ventas would have acquired Sunrise REIT at $15 per unit." This instruction was ample to guide the jury on finding causation. While other instructions might have been given, Kentucky law does not require any of them.

## VI.

---

[4] Specifically, the Court instructed, "HCP did breach its confidentiality agreement by submitting the February 14 topping bid. This fact alone is not sufficient to establish tortious interference. However, it may be considered along with the other evidence, in determining whether HCP engaged in improper interference.

[5] To the extent Defendant complains of the Court's refusal to submit an instruction that Sunrise REIT would have been required under Canadian disclosure law to inform unitholders of any additional bids, even if they could not be considered, the Court finds that the disclosure law is unclear. This deals intensely with fiduciary duties and is a factually driven determination that would likely require its own trial. Even if it were clear that the law would have required disclosure, there is no evidence that the details actually would have been disclosed. Thus, the Court could not give the requested instruction.

Defendant also requests a new trial based on certain of Plaintiff's arguments during closing. The Court has previously ruled that those arguments were within the permissible bounds of closing argument and, even if impermissible, the jury's instruction gave sufficient guidance for considering the evidence properly. (DN # 449.) Only one of these arguments needs further examination at this time. During rebuttal, Plaintiff's counsel argued that the jury should "send a message" from Louisville, Kentucky, to Defendant's headquarters in Long Beach, California, and to Wall Street that this is not proper competition. Defendant contends that such an argument was improper and designed to inflame the passions of the jury.

While the Court agrees that the "send a message" argument was likely improper, *see McCabe v. Mais*, 580 F. Supp. 2d 815, 834-35 n. 13 (N.D. Iowa 2008), the Court does not believe that such statements warrant a reversal of the jury verdict and award of a new trial to Defendant.

> In determining whether there is a reasonable probability that the verdict of a jury has been influenced by improper conduct, warranting a new trial, the Court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the Court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself.

*Michigan First Credit Union v. Cumis Ins. Soc. Inc.*, No. 05-CV-74423, 2009 WL 164088, at * 7 (6th Cir. June 15, 2009) (citing *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980)). In *Cumis*, the defendant complained about an improper analogy used by the plaintiff's counsel in closing. The Court stated,

> Here, the analogy used by [the plaintiff's] counsel consumed little more than one page in a transcript of argument that exceeded one hundred pages; the analogy followed a trial that spanned three weeks. . . . [E]ven where closing argument does rise to the level of misconduct, the misconduct is not prejudicial unless it is "so pronounced and persistent that it permeates the entire atmosphere of the trial."

*Id.* at * 7-8 (quoting *United States v. Lynch*, Nos. 85-5171, 85-5196, 85-5217, 1986 WL 17300 (6th Cir. July 8, 1986)). The facts of this case are similar. Plaintiff did not make the "send a message" argument until his rebuttal, the total of which was approximately five minutes. The trial spanned three weeks. There is simply no evidence that Plaintiff's argument "permeated the entire atmosphere of the trial" or caused the jury to make its determination on improper grounds. "[E]ven if prejudice otherwise could be found in the [argument] at issue, any prejudice was cured by the Court's specific instruction to the jury that attorney comments were not evidence and that only evidence was to be considered." *Id.* at *8. The Court gave such an instruction and believes the jury followed it.

Moreover, other Courts have found that the "send a message" argument does not warrant a new trial. *See Nice v. ZHRI, Inc.*, 105 F. Supp. 2d 1028, 1029 (E.D. Ark. 2000) ("[I]t is appropriate to ask the jury to 'send a message' if counsel is not seeking an inappropriate punitive damage award."); *Alkire v. Mariott Intern., Inc.*, No. 03-1087, 2007 WL 1041660, at * 7 (D.D.C. April 5, 2007) (finding that argument that jury should send a message regarding the type of behavior engaged in was aimed more at negligence than damages and did not warrant a new trial); *Third Wave Tech., Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 1010 (W.D. Wis. 2005) (finding the plaintiff's argument that jury should "send a strong message to [the defendant] and to the other [people like the defendant] out there" that this behavior is unacceptable did not warrant a new trial because the plaintiff limited the argument to "teaching defendant and others that there is a consequence" to their behavior).

Plaintiff's argument in this case closely resembles the arguments in the cited cases. Plaintiff clearly was not seeking additional damages as the Court limited the maximum damages

to those Plaintiff requested in closing. Additionally, the argument was aimed at stopping Defendant's type of behavior, not awarding Plaintiff additional sums to punish Defendant and others. Finally, the case of *Strickland v. Owens Corning*, 142 F.3d 353 (6th Cir. 1998), is illustrative. There, the Sixth Circuit considered whether a new trial was warranted based on the plaintiff's argument that the jury had "an opportunity . . . to tell Owens Corning, to tell the world where you stand, whether you stand for safe products and decency." The Court found that such statements did not warrant a new trial because the plaintiff was not requesting punitive damages. *Id.* at 359. The Court believes that the substance of the argument in *Strickland* is the same as the substance of the argument in this case, and like *Strickland*, a new trial is not warranted here.[6]

## VII.

The parties have jointly moved the Court to supplement the record with certain documents. These documents can be grouped into three categories: (1) a pre-trial motions checklist provided by the Court to the parties on August 18, 2009, (2) drafts of the jury instructions the Court submitted to the parties before issuing the final instructions, and (3) letters sent by the parties' counsel to the Court addressing certain objections and motions.

The Court will supplement the record with the letters from the parties' counsel. Those letters reflect objections of the parties and arguments made to the Court; they are proper for appellate review. The Court will also supplement the record with the pre-trial motions checklist, but cautions that some of the rulings may have changed as the trial progressed and the nature of the evidence became clearer. Only the final rulings of the Court should be subject to proper

---

[6] With respect to a new trial, Defendant finally contends that certain other evidentiary rulings were erroneous and prejudicial. The Court stands by the evidentiary rulings that it made throughout the trial for the reasons stated at the time the rulings were made.

review.  The Court will not, however, supplement the record with the drafts of the jury instructions.  Those drafts were provided to counsel in an effort to work with counsel to determine the best drafting of the instructions on this complicated case.  Those drafts were never presented to the jury and had no role in the decision of the jury.  Thus, they are irrelevant to any issue on appeal.  Only the final jury instructions actually given to the jury can be considered for error.

## VIII.

The final issue before the Court is Plaintiff's motion to alter or amend the judgment to provide full compensation.  Plaintiff makes two requests: (1) to convert damages from Canadian dollars to U.S. dollars on the date of judgment as opposed to the date of injury, and (2) award Plaintiff prejudgment interest.  The Court has previously examined the first issue in a Memorandum Opinion dated August 27, 2009 (DN # 379) and determined that the proper date for conversion is the date of injury.  For the reasons set forth in that opinion, the Court finds that the appropriate date of conversion is the date of injury, April 26, 2007, which was the date used to calculate the damages awarded by the jury.

As for the second issue, prejudgment interest is available as a matter of right where the plaintiff's damages are liquidated.  *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 141 (Ky. 1991).  Generally, liquidated damages are damages "made certain or fixed by agreement of [the] parties or by operation of law.  Common examples are a bill or note past due, an amount due on an open account, or an unpaid fixed contract price."  *Id.* (quotation omitted).  The Kentucky Supreme Court has further defined liquidated damages: "Liquidated claims are of such a nature that the amount is capable of ascertainment by mere computation, can be established

14

with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." *3D Enterprises Contracting Corp. v. Louisville & Jefferson County Metropolitan Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).

Plaintiff argues that the only damages it could recover in this case were fixed at the difference in acquiring Sunrise REIT at $15 per share as opposed to $16.50 per share and that such damages squarely fit within the concept of an "amount . . . capable of ascertainment by mere computation." *Id.* To be certain, these are the damages the jury awarded. However,

> It must be remembered that, in determining if a claim is liquidated or unliquidated, one must look at the nature of the underlying *claim*, not the final award. That is, the fact that we have ultimately determined that 3D is entitled to the liened funds should not be construed as confirmation that the original claim was liquidated.

*Id.* (emphasis in original). The damages awarded were not "fixed by operation of law" like damages arising from a past due note or a fixed contract. Here, there was no breach of a specific contract that required Defendant to pay Plaintiff a specific amount. It was never set that Plaintiff would have to pay an additional $1.50 per unit because of Defendant's conduct. This case is somewhat analogous to a case where the defendant's breach of contract requires plaintiff to pay a third party additional money to finish the contract. There, the amount plaintiff had to pay was determined well before trial, but that does not make those damages liquidated. *See Prosoft Automation, Inc. v. Logan Aluminum, Inc.*, No. 1:03-CV-142-R, 2006 WL 1228773, at *2 (W.D. Ky. April 28, 2006) ("[A]lthough the jury ultimately awarded Prosoft the full amount requested as compensation for those hours, they were not reduced to a certainty in amount *prior to trial*.") (emphasis in original). The same is true here.

Prejudgment interest may also be awarded in the Court's discretion as a matter of equity.

15

*Nucor*, 812 S.W.2d at 143-44.  Courts in Kentucky rarely award prejudgment interest as a matter of equity and this Court declines to do so as well.  The damages involved were not liquidated, Defendant caused no undue delays in the trial of the case and the evidence presented a very close case regarding liability.  On balance, the Court finds that equity does not warrant prejudgment interest.

      The Court will issue an Order consistent with this Memorandum Opinion.

cc:	Counsel of Record